MKD:mes 6640/1 pleading\66401final.wpd

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| TIMOTHY DOYLE, ET AL | : | |
| | : | |
| VS. | : | C. A. NO. 01-409L |
| | : | |
| GREG BRAY, ET AL | : | |

**DEFENDANTS' JOINT POST-TRIAL MEMORANDUM**

J. Renn Olenn, Esq. #0623
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886
PHONE: (401) 737-3700
FAX: (401) 737-5499

Martin K. DeMagistris, Esq. #6089
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886
PHONE: (401) 737-3700
FAX: (401) 737-5499

# TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. THE TRIAL EVIDENCE MADE CLEAR THAT THE PLAINTIFFS WERE FULLY AWARE OF THE COMPENSATION ARRANGEMENTS ON DEFENDANTS' VESSELS AND THAT THEIR IGNORANCE IS A FABRICATION.. . . . . . . . . . . . . . . . . . . . . . . . . . 3

A. ANTHONY RICHARDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
B. TIMOTHY DOYLE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
C. TESTIMONY OF PLAINTIFF BRIAN LAGUE. . . . . . . . . . . . . . . . . . . . 13
D. TESTIMONY OF FELLOW CREWMEN. . . . . . . . . . . . . . . . . . . . . . . 14

1) PHIL RUHLE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
2) KEN PATERSON. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
3) THOMAS RAWLES.. . . . . . . . . . . . . . . . . . . . . . . . . . . 15
4) DAVID FIEDLER.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
5) JIM O'GRADY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

II. LEGAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

A. THE DEFENDANTS ARE ENTITLED TO JUDGMENT BASED ON THE DEFENSE OF LACHES... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

1) THE TRIAL EVIDENCE SHOWED THAT DEFENDANTS DID NOT VIOLATE THE WRITTEN AGREEMENT STATUTE WILLFULLY, INTENTIONALLY, OR IN BAD FAITH... . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
2) THE ANALOGOUS CAUSE OF ACTION FOR LIMITATIONS PERIOD FOR THE PRESUMPTION OF LACHES IS FOUND IN THE FAIR LABOR STANDARDS ACT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
3) THE PLAINTIFFS' CLAIM SHOULD BE BARRED.. . . . . . . . . . . . 24

B. THE INSTANT CASE IS DISTINGUISHABLE FROM THE CASES ON THE WEST COAST IN MANY RESPECTS.. . . . . . . . . . . . . . . . . . . . . . . . . . 28

C. DOUBLE WAGE PENALTY CASE LAW UNDER §10313.. . . . . . . . . . . . . 28

D. PLAINTIFFS' DAMAGES CALCULATIONS DISREGARD THE LANGUAGE OF §11107 AS WELL AS THE NATURE OF THE LAY SHARE SYSTEM. . . . . . . . 30

IV. PLAINTIFFS ARE NOT ENTITLED TO ATTORNEYS' FEES. . . . . . . . . . . . . . . . . 34

V. PLAINTIFFS ARE NOT ENTITLED PREJUDGMENT INTEREST. . . . . . . . . . . . . . . . 35

VI. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# TABLE OF AUTHORITIES

## CASES

*A.C. Aukerman Company v. R.L. Chaides Construction Co.*,
960 F.2d 1020 (Fed. Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Alier v. Sea Land Service, Inc.*, 465 F.Supp. 1106 (D.P.R.1979). . . . . . . . . . . . . 25

*Bjornsson v. U.S. Dominator, Inc.*, 863 P.2d 235 (Ak. 1993). . . . . . . . . . . . . . . 28

*Brown v. The Royal Caribbean Cruises*, LTD., et al.,
2000 WL 34449703 (S.D.N.Y. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*CEH, Inc. v. F/V* Seafarer, 70 F.3d 694 (1st Cir 1991). . . . . . . . . . . . . . . . . . . 23

*Chirrick v. F/V Sharon Lorraine*, 1996 WL 263242 (W.D.Wash. 1996). . . . . . . . 28

*Chretien v. Exxon Company, USA*,
701 F.Supp. 266 (D.N.H. 1988). . . . . . . . . . . . . . . . . . . . . . . . . 2, 22, 24, 25, 29

*Collie v. Fergusson*, 281 U.S. 52 (1930) . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Continental Coatings Corp. v. Metco, Inc.,* 325 F.Supp. 165 (N.D.Ill.1971),
Aff'd, 464 F.2d 1375 (7th Cir. 1972).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Cottrill v. Sparrow, Johnson and Ursillo, Inc.*, 100 F.3d 220 (1st Cir. 1996). . . . . 35

*DelCostello v. Teamsters*, 462 U.S. 151 (1983). . . . . . . . . . . . . . . . . . . . . . . . 22

*Do v. Ocean Peace, Inc.*, 2002 WL 1020670 (Wash.App. 2002). . . . . . . . . . . . . 28

*Donoghue v. IBC/USA (Publications) Inc.*, 886 F.Supp. 947 (D.Mass. 1995). . . . . 20

*Doyle, et al. v. Huntress, et al.*, 301 F.Supp.2d 135 (1st Cir. 2000). . . . . . . . . . . 31

*Doyle, et al. v. Huntress*, et al., 419 F.3d 3 (1st Cir. 2005). . . . . . . . . . . . . . . . 31

*Dymo Indus., Inc. v. Monarch Marketing Sys., Inc.*,
474 F.Supp. 412 (N.D.Tex.1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Flores v. American Seafoods*, 335 F.2d 904 (9th Cir. 2003). . . . . . . . . . . . . . 26, 31

*George v. Kramo Ltd.*, 796 F.Supp. 1541 (E.D.La.,1992). . . . . . . . . . . . . . . . . 36

*Guenther v. Sedco, Inc.*, 866 F.Supp. 786 (S.D.N.Y. 1998). . . . . . . . . . . . . . . . 29

*Harper v. U.S. Seafoods L.P.*, 2001 WL 1428364 (W.D.Wash. 2001). . . . . . . 28, 31

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, et al.*,
501 U.S. 350 (1991).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Madeja v. Olympic Packers, LLC*, 310 F.3d 628 (9th Cir. 2002). . . . . . . . . . . . . 34

*Manuel Int. S.A. v. Rascator Maritime S.A.* , 782 F.2d 329 (2nd Cir. 1986).. . . . . 34

*McCrea v. United States*, 294 U.S. 23 (1935) . . . . . . . . . . . . . . . . . . . . . . . 29

*Mecom v. Livingston Shipbuilding Co.*, 622 F.2d 1209 (5th Cir. 1980) . . . . . . . . . 36

*Miles v. Apex Marine*, 498 U.S. 19 (1990). . . . . . . . . . . . . . . . . . . . . . . . . 23

*Miller v. Arctic Alaska Fisheries Corp.*, 944 P.2d 1005 (Wash. 1997). . . . . . . . . . 28

*Morales v. Moore-McCormack Lines, Inc.*, 208 F.2d 218 (5th Cir. 1953). . . . . . . 25

*Pan American Grain Manufacturing Co., Inc. v. Porto Rico Ports Authority*,
295 F.3d 108 (1st Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Pronav Charter II, Inc. v. Nolan,* 206 F.Supp.2d 46 (D.Mass.2002). . . . . . . . . 2, 24

*Public Administrator of the County of New York v. Angela Compania, Naviera*,
592 F.2d 58 (2nd Cir. 1979), cert. dis. 443 U.S. 928 (1979).. . . . . . . . . . . . . . . 24

*Puerto Rican-American Ins. Co. v. Benjamin Shipping Co.*,
829 F.2d 281 (1st Cir.1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Ramos v. Continental Insurance Co.*, 493 F.2d 329 (1st Cir. 1974). . . . . . . . . . . 24

*Reed v. United Transportation Union*, 488 U.S. 319 (1989). . . . . . . . . . . . . . . . 22

*Rush v. Isbradntsen Co.*, 98 N.Y.S.2d 508 (NY 1949).. . . . . . . . . . . . . . . . . . . . 29

*Sandberg v. KPMG Pete Marwick, LLP*, 111 F.3rd 331 (2nd Cir. 1997). . . . . . . . 23

*Seattle First Nat'l v. Conaway*, 98 F.3d 1195 (9th Cir. 1996). . . . . . . . . . . . . 26, 28

*Seattle-First v. F/V Lady Lynne*, 1995 WL 464536 (D.Ak. 1995). . . . . . . . . . . . . 28

*TAG/ICIB Services, Inc. v. Pan American Grain Co., Inc.*,
215 F.3d 172 (1st Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

*TCW Special Credits v. Chloe Z Fishing Co., Inc.*,
129 F.3d 1330 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 28

*Templeman v. Kris Kraft Corp.*, 770 F.2d 245 (1st Cir. 1985).. . . . . . . . . . . . . . . 34

*Textron v. American Woolen Co.*, 122 F.Supp. 305 (D.Mass. 1954). . . . . . . . . . . 20

*The A.I. Baker*, 76 F.2d 871 (6th Cir. 1935) .. . . . . . . . . . . . . . . . . . . . . . . . . 29

*The Oliver Ames*, 178 F. 740 (D.C.Me. 1910). . . . . . . . . . . . . . . . . . . . . . . . . 29

*The Velma L. Hamlin*, 40 F.2d 852 (4th Cir. 1930) . . . . . . . . . . . . . . . . . . . . . 29

*Triventure Investment, Inc. V. M/V Midas*, 1995 WL 848520 (W.D.Wash. 1995). . 28

*U.S. v. Rafael*, 349 F.Supp.2d 84 (D.Mass. 2004). . . . . . . . . . . . . . . . . . . . . . 35

*Vaughan v. Atkinson*, 369 U.S. 527 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Ventiadis v. C.J. Thibodeaux & Co.*, 295 F.Supp. 135 (S.D.Tx. 1968) .. . . . . . . . 29

*Vinieris v. Byzantine Maritime Corp.*, 731 F.2d 1061 (2nd Cir. 1984).. . . . . . . . . . 29

**FEDERAL STATUTES**

46 U.S.C. §10101. . . . . . . . . . 23

29 U.S.C. §201. . . . . . . . . . 2

46 U.S.C. §10313. . . . . . . . . . 23, 28, 29

46 U.S.C. §10504. . . . . . . . . . 31

46 U.S.C. §10601. . . . . . . . . . 20, 24, 27, 28, 35, 36

46 U.S.C. §11107. . . . . . . . . . 2, 21, 24, 27, 28, 30, 31, 33

46 U.S.C. §531. . . . . . . . . . 1

**STATE STATUTES**

R.I.G.L. §28-14-20. . . . . . . . . . 24

R.I.G.L. §9-1-13 . . . . . . . . . . 23, 24

## INTRODUCTION

It is an uncontested fact that all the money plaintiffs are claiming actually went into the pockets of their fellow crewmen, not to the defendant owners or captains. This is an inherent feature of the lay share system. The contribution of work that goes into the success of the trip is commensurate with the compensation that comes back.

It cannot be overstated that there is nothing illegal or unethical about a discretionary compensation system or paying different crewmen different shares. The defendants could not man their vessels with the best crewmen unless they appropriately compensated fishermen by each individual's contribution to the catch. This is no different than the compensation system required by the original fishing agreement statute dating back to 1792. Each crewman working on a vessel was to be paid "according to the number of fish each caught." 46 U.S.C. §§531-534. This pay practice is as old as the fishing industry and each crewman is paid according to his individual value to the overall trip. Other courts that have decided fishing agreement claims under §11107 have also acknowledged this payment system. *TCW Special Credits v. Chloe Z Fishing Co., Inc.*, 129 F.3d 1330 (9th Cir. 1997) ("A crewman's rate of compensation is determined by his rank, job classification, duties and ability. The rate is then multiplied by the adjusted tonnage of fish caught.")

The defendants did not violate the fishing agreement statute by paying different shares to different crewmen. They violated it by not executing written agreements stating that a crewman's share was determined by the captain according to his experience, abilities, and contribution to the voyage. Defendants have proven that each of these plaintiffs knew about this compensation system from the beginning of their employment. As the trial testimony established, they did not violate the statute with the intention of deceiving any of their crewmen or withholding any rightfully earned compensation. After all, since they received none of the money, there would be no

motive to do so.

As defendants stated in their pre-trial memorandum, they set out to establish three things at trial. 1) That the plaintiffs' knew of the compensation arrangements on the fishing vessels Persistence and Relentless from the time they started, and that their alleged ignorance of the partial share has been fabricated; 2) the defendants' admitted ignorance of the requirements of the fishing agreement statute, though not excused, was not in bad faith or with the intention of misleading any of their crew about the compensation due each hand; 3) the defendants have been prejudiced by the plaintiffs' delay of between six and eight years in filing suit. Based on these three equitable considerations, and in light of the two year analogous limitations period under the Fair Labor Standards Act (FLSA) 29 U.S.C. §201, et. seq., plaintiffs' claims should be barred by the doctrine of laches.

Not only did plaintiffs delay between 6 and 8 years in making their claims, but also, they worked with full knowledge of what and how they were to be paid, making hundreds of thousands of dollars while creating more and more monetary claims for this lawsuit. Only after they voluntarily left these vessels to pursue other careers did the plaintiffs make any claim, or file suit for the retroactive difference. Throughout this litigation, plaintiffs have attempted desperately to explain away or avoid any evidence that they knew about the partial share system until 2001, when they filed suit. They all claim that it came as a revelation. After trial, it is undeniable that this ignorance was fabricated in order to fight the defense of laches. They knew and accepted the compensation system for the entire duration of their employment. Therefore, their claims should be barred pursuant to the equitable doctrine of laches. *Chretien v. Exxon Co., USA*, 863 F.2d 182 (1st Cir. 1988); *Pronav Charter II, Inc. v. Nolan,* 206 F.Supp.2d 46, 54 (D.Mass.2002).

## I. THE TRIAL EVIDENCE MADE CLEAR THAT THE PLAINTIFFS WERE FULLY AWARE OF THE COMPENSATION ARRANGEMENTS ON DEFENDANTS' VESSELS AND THAT THEIR IGNORANCE IS A FABRICATION.

### A. ANTHONY RICHARDS

Plaintiff Anthony Richards is the key to the issue of laches because, according to all plaintiffs including himself, he was the source of their alleged revelations that they had been paid partial shares. (Richards animus toward the defendants was clear stemming from his prior failed lawsuit against the F/V Relentless.) Richards allegedly told the other four plaintiffs when he himself found out that partial shares were paid. Therefore, regardless of evidence of earlier knowledge by the plaintiffs, the very latest they found out about different shares has to be in accordance with Richards' testimony. What he knew and when he knew it is applicable to all plaintiffs.

Richards' testimony was obstructionist and misleading throughout the trial. He went to great lengths to cover all of the possible holes in his claim of ignorance: He claimed he found out about receiving a partial share from viewing a settlement sheet provided by defendants, yet denied knowing what a settlement sheet looked like (Tr.Trans., p. 315:13-24; Tr.Trans., pp. 285:7-287:23); He denied that he was ever aware that an engineer had a separate position on the boat, or that the engineer had any special duties (Tr.Trans., p. 228:5); He claimed that he settled his personal injury claim for a lesser share in 1998 because wanted to "pay more taxes;"(Tr.Trans., p. 295:1-5) He claimed to have spoken about his share only once in over six years on defendants' boats, yet advertised the fact on his fishing gloves to make a point (Tr.Trans., p. 297:8); He admitted in the personal injury case that he was told by "three or four" of his fellow crewmen what they had made on the trips he missed, but still claimed that crewmen never talk about money in the fishing industry; He refers freely to "half shares" and "three quarter shares" in his personal injury testimony, but

claims to have been unaware that they were paid until he reviewed settlement sheets in 2001; (Tr.Trans., p. 260-61; Tr.Trans., p. 315:13-24) He claims he found out he was paid a 7/8 share from seeing a settlement sheet when signing his release for the trip he missed, yet his name was not on that settlement because he was not on the trip due to his injury. (Tr.Trans.,p.272)

The transcript goes on for pages and pages during which Richards avoids answering even the most obvious questions, no matter how clear. The result is a mangled web of inconsistent statements that ultimately point to the truth. He, and his co-plaintiffs, knew all along how they were paid and upon what terms. Their collective unwillingness to simply tell the straight truth, that they were aware of the partial shares from the beginning of their respective employments, and that they want to be paid under §11107 anyway, has prolonged and obstructed this case to the present.

When asked at trial about his understanding of the compensation system from the time he started working for the defendants, Richards testified he did not know. (Tr.Trans.,p.217:1-20) He never asked what he would be paid. He never asked Goodwin, the captains, or anyone else, what would be expected of him, how much he would make, or what his share would be. (Tr.Trans.,p.217-218) When asked why, he stated that it was not his concern and that he was only interested in being employed steadily.

(Tr.Trans., pp. 217:20-218:1)

Q. Did you ask them any financial information at all before you asked for a position?
A. No.
Q. Is there a reason you did not ask?
A. Is there a reason why I did not ask? It was not my concern. I wanted to be employed steadily.

He testified that his understanding of the fishing industry, from the time he started at age 18 in 1985, was that every fisherman, "no matter how inexperienced,"

got paid a "full" share. (Tr.Trans., p. 219:1-16) In fact, all plaintiffs, either in deposition, trial, or pleadings, seem to be familiar with the term "*full share*," apparently believing all crewmen in the fishing industry are paid "full shares." However, none of them ever explain why the term "full" would be used if there was no share lower than a full. If they all believed a full share is what every crewman received, why would it be called "*full*" instead of simply a "*share*."

Richards claimed that he learned of the payment of partial shares when he reviewed settlement sheets provided in the personal injury case. Until then, he and the other plaintiffs claim they were never aware throughout their collective twenty years of employment on these boats that different crewmen of different abilities, experience, and quality, made different shares.[1] Rather, all claim that no one told them, they did not ask about their pay, and that in the fishing industry generally, it is improper to discuss money with a fellow crewman.[2]

Because of testimony he gave in the personal injury action, Richards was constrained to admit that he knew he had been paid a partial share in 1998, almost three and a half years before filing this suit. In 2001, he brought an action for a fall he had on the Relentless in February 1998. He missed two fishing trips as a result. He settled the claim by signing a release in May 1998 for $8,000. (*Defendants' Exhibit E*) In his trial testimony, he stated that 3 or 4 of his fellow crewmen had called him and said they had received between $12,000 and $16,000 for the trips he missed. (Tr.Trans., p. 270:8-19) In negotiating the settlement, he questioned why he was being offered $6,000 or $8,000 to settle his claim, stating in his testimony, "the guys were telling me

[1] Plaintiffs Edwards and Hagaman failed to appear for their depositions. They provided evidence only in the form of answers to interrogatories.

[2] None of the plaintiffs explain why it would be improper to talk about shares if, as they purportedly believed, all crewmen were paid the same.

they made 12,000 to 18,000...what are you doing only paying me three-quarters share for lost wages?" (Tr.Trans., pp.251:12-18; 265:14-19) He stated he had seen a settlement sheet at the release signing that showed he received a 7/8 share. He goes back and forth thereafter, testifying that he did see a settlement sheet and that he did not see a settlement sheet, but rather found out about the different shares from what the crewmen that called him said. (Tr.Trans., p. 275:18) Richards settled his claim for $8,000 in May, 1998, which he acknowledged represented $12,000 with one-third deducted for taxes.

When asked why the purported settlement sheet that he claimed showed he received a 7/8 share would include him even though he missed the trip, he claimed that the "insurance check" would tell him. (Tr.Trans., p. 289:3) Without explaining how the insurance check would explain his share, he then went on to insist that his name should have been on the settlement sheet even though he was not on the trip. (Tr.Trans., p. 289:5-21) When asked why that would be, he essentially did not answer.

His own testimony from the prior trial showed that Joann Greene, the defendants' bookkeeper, showed him the same range as his fellow crewmen had told him over the phone, that they made between $12,000 and $16,000. Greene testified specifically that Richards asked her how much he would have made for the trips he missed and she told him 7/8 share because that was what he received for the prior one. (Tr.Trans.,p.487:3-23) When asked why he accepted the lower end of the range for settlement if he thought everyone received a full share, Richards stated that he preferred to pay more in taxes so that he would get more back at tax time. (Tr.Trans., p. 294:4) When asked directly whether he would rather have been paid $12,000 or $16,000, Richards claimed it depended on whether he would have to pay more taxes, stating, "I mean the more you make, the more you pay in taxes, the more you have to

take out." (Tr.Trans., p. 295:1-5) When confronted with the notion that he placed himself at the bottom of the range because he knew he was not a full-share man, he simply answered no.

Throughout the trial transcript, Richards weaves back and forth between his original statement that he found out in 2001, and his prior testimony that he knew in 1998. What is known however, is that Richards made no inquiry or objection about his share to defendants at any time between 1998 and August of 2001 when suit was filed.

Tr.Trans., pp. 302:16-303:11

Q. So that you kept working, believing that the shares, the amounts you were getting, were wrong?
A. I kept working under the belief that if they had done wrong, the law would, in fact, effect itself upon them.
Q. Did you make any effort to determine whether any other amounts you had been paid were less than a full share?
A. No.
Q. Did you ask Joanne, Dick, Greg or anyone what you had been paid on other trips?
A. No.
Q. Excuse me– other trips which may not have been a full share?
A. No.
Q. But you believe the payment system on this boat was wrong?
A. That is correct.
Q. And you continued to work on it?

The only objection Richards acknowledges making was in 1998, purportedly as a result of his knowledge that he was paid a 7/8 share for his missed trip. On page 297 of the trial transcript, Richards appears to once again reconfirm that he did in fact see a settlement sheet at the release that showed he received a 7/8 share, which prompted him to confront Dick Goodwin. (Tr.Trans., p. 297:8) He stated that he confronted Goodwin who told him the shares are determined by the captain, Greg Bray. Richards went to Bray who told him that they were determined by Goodwin. He then testified that he went back to Goodwin, who apparently said, "If you don't like what you're getting paid here, then you can either walk off the boat, or do what you have to do." (Tr.Trans., p. 298:3-5)

However, the previous day of trial, Richards testified that the argument was prompted by Goodwin in response to Richards taping "3/5" to his gloves. Goodwin allegedly "pulled [him] to the side " and asked him if he had a problem with his pay. (Tr.Trans., p. 238:12-24) Likewise, Richards stated that Goodwin told him if he didn't like what he was being paid, he could go somewhere else.

Richards told still a third version of this alleged argument at his deposition in 2002. He again stated that it happened when he confronted Goodwin in response to being paid 7/8 on the settlement sheet, but made no mention whatsoever of Goodwin threatening to fire him or telling him to walk off the dock. (Tr.Trans., pp. 298-299) He simply stated that Goodwin told him that it is the captain who determines the share and that after this conversation, he just "kept working." (Tr.Trans., p. 299)

When asked why he never made any other inquiry until filing suit in 2001, Richards claimed he was afraid he would be fired because of this previous argument with Goodwin. (Tr.Trans., pp. 303:20 to 304:1) He also claimed that he did not make any inquiries thereafter because it seemed like he was making full share because his "checks" were higher. (Tr.Trans., p. 300:23) As can clearly be seen from defendants' Exhibit BB, his checks did not increase at all. Richards was injured on trip 565 in February of 1998, which appears on the second page of Richards' spreadsheet in exhibit BB. He missed 566 and 567. The amounts of his paychecks did not increase thereafter compared to trips before trip 565.

Goodwin testified at length about the share system that he has used since he first owned his larger boats in the mid to late 1960's. (Tr.Trans.,p.453:1) He testified that he used to hand out the settlement sheets to each crewman until the 1970's when he discovered a few of them in a bar in Galilee, apparently left behind by some of his crewmen after a trip. (Tr.Trans.,p.163:15-164:19) Not wanting every boat and crewman in the Port of Galilee to be privy to his trade secrets and finances, he adopted

a policy of only allowing crewmen to look at the settlement sheets, instead of getting their own copies. He testified that he has never kept a crewman's share a secret from them and that any crewman can look at the settlement sheets for any trip. (Tr.Trans., p.71:9-17)

As all five of plaintiffs' former fellow crewmen testified at trial, crews on fishing vessels always talk about money and shares, both on the boat and off. Further, as both Goodwin and the other crewmen testified, there has never been a policy that crewmen are not allowed to talk about money or shares on these boats. (Tr.Trans.,p.163:9-17)

Among the other inconsistencies, earlier in his testimony, before claiming to see settlement sheets in 2001 that indicated he was paid partial shares, Richards testified that he could not even identify a settlement sheet. Yet, later he testified that reviewing the settlement sheets at his attorney's office is precisely how he realized he was paid partial shares.

During examination by his attorney, Richards states:

Tr.Trans., p. 315:13-24

Q: And did you review any documents at that time, Mr. Richards?
A: In your office, yes, I did.
Q: And what documents were those?
A: Settlement sheets.
Q: And what did they tell you Mr. Richards?
A: They had broken down what people were dispensed for pay.

On examination by defense counsel, however, when handed the settlement sheet that is Defense Exhibit GG, Richards testified:

Tr.Trans., pp. 285:7-287:23

Q: Did you or did you not see a document like this – figures may have been different, but did you see a document like this at the time that you went to Huntress, Inc. To settle your personal injury claim?
A: This is the type of paper that was handed. That's what I said in the statement before. I'm not sure if this is a settlement sheet or not, but this is

what they handed me to look at and obviously the numbers weren't the same.
Q: What do you believe a settlement sheet to be? Have you ever seen a settlement sheet?
A: Yes, on other boats I have. It comes out printed out, typed paper with everybody's share at 1.0 percent and everybody's pay would be the same and then it would have the deductions, like it has over here apparently on the right-hand corner, which I mean this shouldn't be on a piece of paper like this. This should be on a proper display, what's going on, not somebody's hand scratch on a piece of paper…
Q: Mr. Richards. Mr. Richards, you saw a sheet like this at the –
A: Yes.
Q: – Settlement conference.
A: I don't know. This is considered – that's what I mean, I don't know if this is considered a settlement sheet. Not only that, or is it a sign-in sheet?
Q: Well, Mr. Richards –
A: If that's what they handed me, it doesn't say settlement sheet at the top, it says trip 565.
Q: Mr. Richards, when you testified earlier –
A: Is that, in fact, a settlement sheet?
…
Q: All right. So now we agree that this – a document like this –
A: Yes.
Q: – was shown to you at the time?
A: I don't know if the numbers were the same, but correct.
Q: Okay. Now –
A: Is that, in fact – is that, in fact, the settlement sheet which it ought to be, right?
Q: It is a settlement sheet. Mr. Richards, when you…

Richards testified to defense counsel that he could not even identify what a settlement sheet looked like. Then, at the end of his testimony, he tells his own lawyer that he first realized he was paid partial shares because he reviewed the stack of settlement sheets provided by the defendants in 2001.[3]

With his previous lawsuit and many years of experience, Richards' claim of ignorance of partial shares made it impossible for him to successfully deny having that knowledge.

[3] Only reviewing Richards' entire testimony in totality reveals its inconsistencies and untruthfulness.

Richards fabricated his "argument" with Goodwin for trial in order to justify his failure to make any claim or inquiry about his shares. The truth is Richards never had a conversation with either Goodwin about his share in 1998. Goodwin stated emphatically that the conversation never took place and, more importantly, he has never told any crewman in his fifty years in the industry that they could walk off the dock if they did not like the way he did things. (Tr.Trans.,p.453:18-454:9) In fact, as Goodwin and Joanne Greene testified, the captains, not Goodwin, determine the shares. (Tr.Trans., p.449:8) Goodwin simply calculates the financials on the summary sheets after each trip. (Tr.Trans.,p.440-450) It would confound the defendants' compensation system for anyone but the captain to decide shares.

Richards' testimony taken as whole reveals that he was fully aware from the time he started on these vessels, and likely well before that, that new, inexperienced, unskilled, or simply lesser fishermen, are paid lesser shares accordingly. This is the way it has been in the lay share system for centuries. As the purported source of the other four plaintiffs' knowledge of the partial shares, their contention that they learned from Richards, either in 2001 or 1998, is equally implausible.

## B. <u>TIMOTHY DOYLE</u>

As contradictory as Richards' testimony was, plaintiff Tim Doyle wasn't even serious about pretending not to know the partial share system. His testimony was read at trial.

<u>Tr.Trans.</u>, pp. 373:9-376:16

Q. So you knew from talking to the guys in the bar, who were your friends onboard the Relentless, that you had to go down there, put in some work, and when a space became available and if you worked well, you would get to go?

A. Yes.

Q. Did they talk about how they got paid?

A. No.

Q. Did you ask how they got paid?

A. No.

Q. Did you say, what is this worth?
A. No.
Q. So when you went down there to try your hand at fishing, you had no idea about how you were going to be paid, is that right?
A. No, I had no idea how I was going to be paid.
Q. When you talked to all those fellas at the bar, was money ever discussed?
A. No.
Q. Was payment ever discussed?
A. No.
Q. Do you know if it was a salary, or a wage, or a share?
A. I had no idea.
Q. Did you grow up in South Kingstown?
A. Yes.
Q. Do you know a lot of fishermen?
A. I knew of them.
Q. So you showed up at the Relentless as a person who was about what, 25 years old?
A. About that.
Q. And you had no idea what a share was?
A. No.
Q. Or how a fishermen got paid?
A. No.
Q. Do you have any fishermen in your family?
A. No.
Q. Did you hang around with any fishermen, any of the guys at the bar?
A. No.
Q. But you hung around with the guys at the bar?
A. Yes.
Q. The answer is yes?
A. Yes.
Q. Is there something humorous about this?
A. No.
Q. I am just wondering why you keep smiling and laughing.
A. I don't know. That's just the way I am.
Q. Did you at any point in time ever inquire about how you were going to be paid?
A. No.
Q. Ever?
A. No.
Q. The answer is no?
A. No.
Q. You never did?
A. No.
Q. Do I understand that you never had a discussion with any of your fellow crewmen about how you were to be paid?
A. Not that I remember.
Q. So through out the entire time you worked aboard the Relentless, nothing was said to you by anybody who employed you how you would be paid?
A. No.
Q. And you never asked?
A. No.
Q. Correct?
A. Correct.
Q. And all those fishermen you drank with in that bar and you hung around with and you worked with, you never found out how they were being

paid or how you were going to be paid?
A. No. It wasn't talked about.
Q. What is the first thing that went through your mind when somebody handed you a check?
A. Thanks.

Doyle likewise testified that Richards' contacted him and told him about the partial shares.

Tr.Trans., pp. 385:20-386:7

Q: Well, do I take it it was a big surprise to you when you found out that you didn't get a full share?
A: When Tony called me and told me, I was very surprised, yes.
Q: Tony called you and told you?
A: Yes.
Q: The answer's yes?
A: Yes.
Q: When you were very surprised, what did you do about it?
A: I contacted Merlyn.

Doyle essentially made a joke of what he knew about the share system and when he knew it. In addition to his deposition testimony, Dave Webb, who was one of his fellow crewmen on the Relentless, told him precisely about the partial share system as he testified to at trial.

Webb knew Doyle socially before Doyle had ever fished. Doyle was a bartender at a local club in Narragansett at the time. Webb testified that he personally referred Doyle to the defendants' boats when Doyle expressed an interest in fishing. (Tr.Trans., pp. 359-360) He stated that Doyle and he had a conversation about the share system and how fishermen got paid. (Tr.Trans., p. 360:1-16) He specifically described to Doyle that he would not make what Webb was making at the time as an experienced crewman, but that Doyle could work his way up to a full share. (Tr.Trans., pp. 360-361). He also testified that he and Doyle talked specifically about their paychecks after Doyle started fishing. (Tr.Trans., p. 362:11-24)

Webb also testified that shares were talked about freely among crewmen on the vessel. (Tr.Trans., p.361:16-22)

### C. TESTIMONY OF PLAINTIFF BRIAN LAGUE

Brian Lague was brought on the vessel through Richards. (Tr.Trans.,p.394:22-395:4) However, he never asked Richards, or anyone, how he would get paid or how much he would make. (Tr.Trans.,p.395:5-14) In fact, he testified that he never asked either captain or fellow crew anything about how he would be paid throughout his years on the boat. (Tr.Trans.,p.396:21-397:11) He claimed only that he "knew there was a thing they called sharing." (Tr.Trans.,p.397:12) Nor did he ever talk about his pay or the amount of his paycheck with fellow crewman and friend of at least twenty years, Anthony Richards, whose affluent lifestyle he described as the reason he began fishing in the first place. (Tr.Trans., pp. 390:19-391:16)

Not surprisingly, Lague testified that the first time he realized that partial shares were paid was when Richards told him in 1998. When asked about when he found out about partial shares at trial, he claimed that Richards' told him in 1998, when Richards claimed he found out.[4]

Tr.Trans., pp. 400:20-401:7

Q. Did there ever come a time when you learned that you were entitled to additional compensation?
A. Yes.
Q. When was that time?
A. That time was after Mr. Richards had his hip injury and I found out I wasn't being paid as much as the regular crew.

Neither plaintiffs Hagaman nor Edwards appeared for their depositions and neither testified at trial. However, it is undisputed that Richards was the alleged source of their knowledge of the partial share system. As discussed below, Ken Paterson and Jim O'Grady, Edwards' fellow crewmen on the Persistence, testified that they had conversations with Edwards, among other crewmen, about money and shares

[4] See Exhibit E, Release executed by Anthony Richards for prior personal injury action; date of injury 2/18/1998.

throughout his entire time on the vessel, and that such conversations were commonplace. This evidence went unchallenged by Edwards.

### D. TESTIMONY OF FELLOW CREWMEN

The passage of time made it difficult for defendants to locate plaintiffs' fellow crewmen that could remember specific instances when they discussed shares, or partial shares, with plaintiffs. However, five of their fellow crewmen, both current and former employees, were able to be located that could recall specific instances where they talked about their shares or compensation with the plaintiffs.

#### 1) PHIL RUHLE

Ruhle worked for the defendants up until 1999, when he bought his own vessel. Ruhle testified that he had a conversation with Tony Richards in the Fall of 1996 when they were both crewmen, after Richards became cook. (Tr.Trans., p. 417:15-19) He specifically recalled the time because it was right after the boats had been lengthened, which had taken six months. (Tr.Trans., p. 417:20-24) Ruhle was complimenting Richards on the job he was doing as cook. Ruhle testified that his ulterior motive was to ask Richards not to use so much garlic in his cooking. (Tr.Trans., pp. 418:17-419:11) In response to the compliments, Richards stated that he hoped that Greg (Bray) would notice and bump him up to a full share because of his effort.

Ruhle also testified that it was a common occurrence for crewmen to talk about money and shares. (Tr.Trans., pp. 419:12-420:-21) He remembered Richards having 7/8 on his gloves as well. (Tr.Trans., p. 422:16-24) Ruhle also testified He stated that on his boat he did not start using fishing agreements until 1999, and was unaware of any requirement to do so before then. (Tr.Trans., pp. 424:17-425:5)

### 2) KEN PATERSON

Paterson is currently the engineer on the Persistence and was a crewman on the Persistence during plaintiff Edwards' eight years on the vessel. He testified that he had several conversations with Edwards over the years about the share Edwards was making, including the fact that it went up when he was running the packing line, and down when he came back after leaving the boat for a period of time. (Tr.Trans.,p.428:22;429:6-431:13) He also stated that discussions and comparisons of pay and shares occurs, and occurred, often on the Persistence. (Tr.Trans.,p.431:15-434:2)

### 3) THOMAS RAWLES

Rawles has been a commercial fisherman for 35 years and had worked on the Relentless as a crewman for ten years until approximately two years ago. (Tr.Trans., p. 335:19) He worked with plaintiffs Lague, Doyle, and Richards on the relentless. He testified that Richards spoke to him directly regarding their respective shares. He stated that on more than one occasion, Richards would boast about the fact that Richards made more money than Rawles, who was significantly older than Richards. (Tr.Trans., pp. 334:14-335:6) He also stated that in his experience, a new crewman never gets a full share when he first starts on a new boat, no matter his experience. (Tr.Trans., p. 335:1-7)

### 4) DAVID FIEDLER

Fiedler and Richards were a team on the packing line and in the freezer. Fiedler testified that Richards approached him sometime during the Summer squid season in 1997, before Richards was injured in 1998, and asked him why Fiedler thought Richards was receiving a 7/8ths share. (Tr.Trans., pp. 347:16-348:4; 354:7-19)

Fiedler told Richards that he thought it was because Richards was not showing up for boat work while the vessel was docked in between trips, but that Richards should just go and talk to Captain Bray about it. (Tr.Trans., pp. 348:1-349:6; 350:15-17) As noted above, Richards remembered this conversation with Fiedler, but testified that it occurred after his injury in 1998.

Fiedler also stated that his recollection of Richards' putting "7/8" on his gloves was that it occurred before, not after, Richards was injured. (Tr.Trans., p. 346:11-15) Again, as stated above, Richards testified that he had put "7/8" on his gloves after his personal injury claim in 1998.

### 5) JIM O'GRADY

O'Grady now owns and operates his own boats in Point Judith. He worked as a crewman with plaintiff Edwards on the Persistence until approximately 1995. (Tr.Trans., p. 175:12) O'Grady stated that his experience aboard the Persistence and all other boats he had been on, was that crewmen always talked about money and shares. (Tr.Trans., pp. 179:15-180:8) They talk about what they received on the last trip; what they expect to get on the current trip, etc. (Tr.Trans., p. 186) O'Grady specifically stated he was in conversations about shares which included Edwards. (Tr.Trans., 184:10)

As the owner and captain of two fishing boats in Point Judith, O'Grady stated he has not paid a partial share in a while, but has in the past. He differentiated between a boat with a four-man crew and a boat with twelve or thirteen like the Relentless and Persistence, and stated that it's much easier to hide or slack off on a boat with a larger crew. (Tr.Trans., 201:1-24)

Doyle, Richards, Lague, Edwards, and Hagaman, were all lying. Instead of allowing their case to proceed on the merits, acknowledging their understanding of the

defendants' share system, they chose to get caught up in a web of untruths instead of letting their claims be decided on the truth and the merits of the law.

## II. LEGAL ARGUMENT

### A. THE DEFENDANTS ARE ENTITLED TO JUDGMENT BASED ON THE DEFENSE OF LACHES.

The above testimony and statements made under oath show clearly that the plaintiffs knew the compensation arrangement on the defendants' boats from the beginning. What that and the fact that they lied about it, means to their case is left to be decided by the court. As defendants stated in their pre-trial memorandum, several other inquiries are extremely relevant to the impact that plaintiffs knowledge has on this court's decision. Whether the defendants willfully and intentionally failed to comply with the fishing agreement requirement in bad faith; whether the defendants have been prejudiced by the passage of time; and finally, the most analogous period of limitations to apply for a laches determination.

Though ignorant of the law, it is evident that defendants did not violate the law in bad faith, willfully or intentionally. Because of the lay share system of compensation, one of the last true merit systems, the defendants retained no portion of the share money distributed to the crew. All of the crewshare went into the hands of the fellow crewmen long ago. Further, through the testimony of President and owner Dick Goodwin and bookkeeper Joanne Gillan, it is evident that an effort, though inadequate, was made to distribute and execute fishing agreements with all of their crewmen.

#### 1) **The trial evidence showed that Defendants did not violate the written agreement statute willfully, intentionally, or in bad**

**faith**.

The fishing agreements used by the defendants beginning in 1993 came from the boats' insurance company[5] and included, among other language, issues such as the crewmen's duty to notify the owner of injury within 7 days, the policy against drugs and alcohol on the boat, the disclosure that fishing is a hazardous occupation, that a crewman should be fit for duty, etc. (Tr.Trans.,p.454:16-455:7) As Jim O'Grady testified, as a boat owner, he was of the understanding that the agreements were for personal injury and drug policy issues. (Tr.Trans.,p.195:3)

Defendants' failure to explain in the agreement the way the crewshare was distributed among the crew occurred because since time out of mind, all lay share fishermen know they work for a share of the catch and inexperienced crew get smaller shares than experienced "full share" crewmen. The legal importance of stating the obvious in the agreement unfortunately escaped the defendants.

The vessels themselves require the payment of partial shares, and strongly indicate to any reasonable person, given their size and complexity, that they would not receive the same compensation as an already established crewman. Unlike smaller vessels that use refrigeration or ice, which unload and pack the fish at the dock, the Relentless and Persistence are more akin to floating factories. They need crews large enough to haul, freeze, package, and store, 600,000 lbs. of product while spending two weeks at sea. Being so large with systems this complex, they have crewmen of varying experience and ability. Some do nothing more than pack fish and stack them in the freezer. Others, in addition to working the packing line, help to haul in the nets, mend the nets, stand wheel watch for the captain, monitor and adjust the boat's ballast system. These are not tasks that can be done by any person willing to go on a boat and

[5] These contract claims are not covered by insurance.

try his hand at fishing, but take time and experience to master.

However, there are those with less technical knowledge that take the initiative to mop the packing room floor after a haul, clean the head or galley, start packing fish early, or simply work later.

Then there is dock work. Crewmen, along with captains and engineers, perform dock work or "boat work," to get the boat ready for the next trip. Some show up at the dock and work eight or nine hours a day for two or three days. Others show up and work five hours. Others don't come at all except to get their paychecks. But the boat cannot go out until it's ready, and crewmen who quit early leave more work for the other hands. When the work gets done, the boat can go out and everyone can make money. It is for these reasons that the shares reflect the contribution to the voyage.

The fishing agreements should have reflected this arrangement explicitly and it was a violation of §10601 not to do so. However, because the boats did not keep any of this money, and because the defendants have provided uncontradicted testimony that there was no malicious intent to deceive or other bad faith, the defendants rely upon their equitable defenses. The defendants indeed got the agreements wrong, but the paychecks right.

**a. Plaintiffs' Argument That the Defendants Have "Unclean Hands" Is Misplaced.**

The doctrine of unclean hands requires a showing of "unconscionable conduct" on those seeking equity. *Donoghue v. IBC/USA (Publications) Inc.*, 886 F.Supp. 947, 954 (D.Mass. 1995); *Textron v. American Woolen Co.*, 122 F.Supp. 305 (D.Mass. 1954). As discussed above, the defendants have provided substantial evidence that there was no malice, motive, nor intent to deceive, and that no deception in fact occurred, since these plaintiffs clearly knew of the broken share system. The plaintiffs

themselves have not produced any credible evidence of bad faith whatsoever.

Secondly, plaintiffs' very claim would not exist without defendants' so-called unclean hands. Specifically, plaintiffs are attempting to claim that the defendants' failure to provide valid fishing agreements absolves them of their delay in filing suit and precludes a laches defense. However, the defendants' failure under §10601 has nothing to do with the fact that the plaintiffs sat on their rights and delayed for six to eight years in filing suit, all the while fully aware of the factual bases of their claims. As discussed below, ignorance of the law is no excuse, for either plaintiffs or defendants. *Chretien v. Exxon Co., USA*, 863 F.2d 182 (1st Cir. 1988); *Pronav Charter II, Inc. v. Nolan,* 206 F.Supp.2d 46, 54 (D.Mass.2002).

The remaining question for the court is what impact the plaintiffs' knowledge of the partial share system (despite the absence of a writing) has on their cases in light of the defense of laches.[6] Can crewmen who are aware of the basis of their pay for years, and continue to work thereafter, invoke the remedies of 46 U.S.C. §11107, and reap the benefits of their delay? How long is too long to file suit or make a claim and how much prejudice satisfies laches.

---

[6] The court may also take into consideration the plaintiffs untruthfulness during and leading up to trial. See generally *Ciulla v. Rigny*, 89 F.Supp.2d 97 (D.Mass. 2000). "This is a case abounding in ironies. Ciulla's trial testimony about the strip search was a deliberate, straight-out, bald-faced lie...FN10. This is not an inference drawn from the jury verdict. It is the Court's own finding drawn from presiding over the trial. Attorneys' fee petitions are equitable matters, tried to the court in civil rights cases, see *King v. Greenblatt*, 560 F.2d 1024, 1027 (1st Cir.), cert. denied 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978), so it is both necessary and appropriate to make an explicit finding, see id." *Id.* at 105.

**2) <u>The Analogous Cause of Action for Limitations Period for the Presumption of Laches is found in the Fair Labor Standards Act</u>.**

Although the two components of laches are unreasonable delay and prejudice to the defendant, there is no set formula for what constitutes laches. Rather, it is analyzed on a case by case basis, according to the particular facts presented. Because of the inherent factual analysis involved, laches is within the sound discretion of the trial judge. *Puerto Rican-American Ins. Co. v. Benjamin Shipping Co.*, 829 F.2d 281, 283 (1st Cir.1987); *Chretien v. Exxon Company, USA*, 701 F.Supp. 266 (D.N.H. 1988) (Barring seaman's wage claim under doctrine of laches for unexplained two-year delay).

In applying laches, the court begins by borrowing the limitations period applicable to the most analogous cause of action to the one at bar, whether from federal or state law. "That limitations period is not per se dispositive, but rather courts rely upon it to establish burdens of proof and presumptions of timeliness and untimeliness." *TAG/ICIB Services, Inc. v. Pan American Grain Co., Inc.*, 215 F.3d 172, 175 (1st Cir. 2000). In maritime cases, when the complaint is filed outside the analogous limitations period, there is a presumption of laches. *Id.* at 175-76.

Generally, in choosing a limitations period for a federal claim, a court adopts the limitations period applicable to the most analogous state cause of action. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, et al.*, 501 U.S. 350, 355 (1991). However, a federal limitations period may be used *"when a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking." Id.* at 356, quoting *Reed v. United Transportation Union*, 488 U.S. 319, 324 (1989), quoting *DelCostello v. Teamsters*,

462 U.S. 151, 172 (1983); *Brown v. The Royal Caribbean Cruises*, LTD., et al., 2000 WL 34449703 (S.D.N.Y. 2000), citing *Sandberg v. KPMG Pete Marwick, LLP*, 111 F.3rd 331, 336 (2nd Cir. 1997) (emphasis added).

In *Brown v. The Royal Caribbean Cruises, LTD*., et al., 2000 WL 34449703 (S.D.N.Y. 2000), a case similar to the one at bar, the court found "the most analogous cause of action to...claims for unpaid overtime wages and penalty wages under 46 U.S.C. §10101, et seq. and §10313 [is one for] unpaid overtime compensation pursuant to the Federal Fair Labor Standard's Act ("FLSA")." *Id*. at 3 (emphasis added). The basis for the court's decision was succinctly stated. "[The FLSA statute is the] most appropriate statute to employ in this instance because...it is a statutory remedy that provides for repayment not only of unpaid overtime wages, but also an additional "penalty wage" equal to the amount of unpaid overtime wages." *Id.*

Under 29 U.S.C. §255(a), the limitations period for FLSA actions to recover unpaid wages and liquidated damages is two years, or three years for wilful violations. The court in Brown was applying the limitations to the double-wage penalty of 46 U.S.C. §10313 which carries a wilfulness requirement. Section 11107 does not, therefore, the normal two year period is applicable.

Unlike Rhode Island's ten year default limitations period under G.L. §9-1-13 for claims not otherwise limited, the FLSA provides a limitations period specifically for the enforcement of statutory employment rights. R.I.G.L. §9-1-13. A time limitation applicable to employee rights statutes is far more analogous to this case than a ten year default period.

The federal policies at stake also weigh heavily in favor of a federal limitations period since plaintiffs' cause of action is grounded solely in admiralty. The rules, obligations, rights, and liabilities, applicable to seamen and their employers are created and almost exclusively overseen by Congress and the federal courts. In light of the

nationwide application of the general maritime law and the federal maritime statutes, federal courts have often cited the Constitutional principle that admiralty law should be "a system of law coextensive with, and operating uniformly in, the whole country." *CEH, Inc. v. F/V* Seafarer, 70 F.3d 694, 700 (1st Cir 1991), quoting *Miles v. Apex Marine*, 498 U.S. 19, 27 (1990). Though the uniformity principle has been traditionally applied to preclude state, common law, or general maritime actions that conflict with federal statutory causes of action, the purpose of the uniformity principle is still applicable to this case. The rights, duties, and liabilities established in 46 U.S.C. §§10601 and 11107 reflect policies that sound distinctly in admiralty.

An action under the FLSA is also more analogous than the three year period in §28-14-20 for the Payment of Wages. Although the Payment of Wages statute relates to claims for back wages, plaintiffs are not claiming that they were not paid their earned wages. They seek damages in the nature of *penalty* wages. Considering the purely federal policies at stake here, the FLSA contains the most appropriate limitations period.

**3) The Plaintiffs' Claims Should be Barred by Laches.**

At trial, plaintiffs made much of their claim that they were unaware of their rights under §11107 until 2001. However, even in admiralty, ignorance of the law is no excuse, and cannot overcome a laches defense. *Chretien v. Exxon Co., USA*, 863 F.2d 182 (1st Cir. 1988); *Pronav Charter II, Inc. v. Nolan,* 206 F.Supp.2d 46, 54 (D.Mass.2002). It is the factual basis of a plaintiffs' claim that counts for laches principles. Otherwise, laches would be no different than a defense of waiver.

The plaintiffs had full knowledge of the share system for between 6 and 8 years before filing suit. The vast majority, if not all of the hundreds of trips taken by the plaintiffs which constitute the basis of their alleged damages occurred years before

filing this action. There must be some reasonable time limit; some cutoff. For these reasons, and because defendants are entitled to a presumption of laches under the two year limitations period, plaintiffs claims should be barred. *TAG/ICIB Services, Inc. v. Pan American Grain Co., Inc.*, 215 F.3d 172 (1st Cir. 2000); *Ramos v. Continental Insurance Co.*, 493 F.2d 329 (1st Cir. 1974); *A.C. Aukerman Company v. R.L. Chaides Construction Co.*, 960 F.2d 1020, 1034 (Fed. Cir. 1992); *Public Administrator of the County of New York v. Angela Compania, Naviera*, 592 F.2d 58, 64 (2nd Cir. 1979), cert. dis. 443 U.S. 928 (1979); *Morales v. Moore-McCormack Lines, Inc.*, 208 F.2d 218, 220 (5th Cir. 1953). None of the plaintiffs, and certainly not Edwards or Hagaman, neither of whom testified, provided any testimony or evidence rebutting defendants' presumption of laches.

However, regardless of the presumption, it is clear that the length of time that has passed since these plaintiffs first worked for defendants and the time they filed suit in 2001, has resulted in significant prejudice. The five plaintiffs began working for defendants at various times between six and eight years before filing suit. Knowing full well how shares were allocated, plaintiffs continued in the defendants' employ over the next several years, accruing greater and greater "damages," trip after trip, year after year. Now, after all of the plaintiffs have moved on to other ventures, each of them has tallied their partial shares accrued over the years, and now demand to be paid full shares for trips occurring many years ago.

With that knowledge and continued work for partial shares, they should not be able to now claim compensation that they knew they had not earned; that compensation that was paid into the hands of their fellow crewmen, who were more experienced and contributed more to the catch, not the vessel owners or captains.

The equitable doctrine of laches protects plaintiffs from the often harsh consequences of statutes of limitations by requiring a showing of prejudice caused by a

delay in filing suit. However, it was not meant to allow plaintiffs to benefit from their delay by enjoying a windfall after they've maximized their damage. *Chretien*, Supra. at 271, citing *Alier v. Sea Land Service, Inc.*, 465 F.Supp. 1106, 1115-16 (D.P.R.1979).

Although it is rarely the duty of an employee to insure its employers' compliance with federal laws, the prejudice resulting from the plaintiffs' delay must be looked at in an objective manner. Two considerations require a finding in favor of the defendants as to the laches defense. First, the plaintiffs' claim of ignorance of the defendants' compensation system is a fabrication as the trial evidence indicates. Secondly, the defendants have shown that there was no bad faith involved in failing to provide fishing agreements stating that the lay share system was discretionary. The very purpose of written agreements in the maritime industry is to prevent coercive and deceptive employment tactics by unscrupulous vessel owners. *Flores v. American Seafoods*, 335 F.2d 904, 913 (9th Cir. 2003), citing *Seattle First Nat'l v. Conaway*, 98 F.3d 1195, 1199 (9th Cir. 1996). However, where crewmen are paid that to which they are entitled, and particularly where no such practices are implicated, it is unfair to impose such a drastic penalty after the length of time and the number of trips involved in this case.

In *Flores*, the Ninth Circuit refused to void written fishing agreements which did not include details about how bonuses were allocated. The court held that, although portions of the compensation system were oral instead of written, "[it would be improper] to void the agreement under section 10601(a) [unless] the oral terms were imposed under duress, or involved the kind of coercion or deception that section 10601(a) is designed to prevent." *Id.* at 914.

Similarly, defendants have shown that the failure to comply with §10601 was not done for any illicit purpose, that all crewmen are well aware of what their compensation is based on, and that they all have full access to defendants' financial

records to determine their share for any given trip. In fact, the plaintiffs themselves do not claim that they would be entitled to any more money than they received under a simple breach of contract theory.

If laches does not bar these plaintiffs after this length of time, these defendants, and any other fishing vessels having failed to comply with §10601, in good faith or not, could be required to compensate every crewman they have employed over the last decade that received partial shares, regardless of what the crewmen knew of the compensation arrangement. The impact of the plaintiffs' untimeliness is clearly sufficient to bar these claims in the interests of equity.

The most directly analogous scenario to the laches present in this case is found in patent infringement case law, which preclude claims under laches for similar reasons. Specifically, laches will preclude an intellectual property infringement case where the plaintiff delays suit to the point where damages are maximized. *Continental Coatings Corp. v. Metco, Inc.,* 325 F.Supp. 165 (N.D.Ill.1971), Aff'd, 464 F.2d 1375 (7th Cir. 1972); *Dymo Indus., Inc. v. Monarch Marketing Sys., Inc.*, 474 F.Supp. 412, 415 (N.D.Tex.1979) ("a patentee cannot sit idle while an infringer builds up its business to the point that the monetary reward from an infringement suit justifies its expense."). This is precisely the inequity at work here.

Rather, the court's decision to bar plaintiffs' claims through laches should be made in light of the following findings of fact: 1) that the statutory violations were not committed in bad faith, with an intent to coerce, mislead, or deprive the plaintiffs of income rightfully earned; 2) that these plaintiffs were aware of the nature of defendants' compensation arrangement; and 3) that the defendants themselves did not reap the benefits of their failure to provide fishing agreements. The money at issue went solely into the hands of the plaintiffs fellow crewmen.

Where one or more of the above elements are missing, or the extreme delay at

issue in this case is not present, a court very likely could find the laches defense to be unconvincing. In fact, the Ninth Circuit and the Supreme Court of Alaska have addressed §10601 and §11107 in a dozen or so cases. However, plaintiffs can point to no case involving even close to the length of delay or the number of past fishing trips at issue here.

### B. THE INSTANT CASE IS DISTINGUISHABLE FROM THE CASES ON THE WEST COAST IN MANY RESPECTS.

All of the West Coast cases are distinguishable from the case at bar. Many were claims made against mortgagee banks, not vessel owners, in vessel foreclosure proceedings for voyages where the plaintiffs-crewmen had not been paid at all. *TCW Special Credits v. Chloe Z Fishing Co., Inc.*, 129 F.3d 1330 (9th Cir. 1997); *Seattle-First Nat'l. Bank v. Conaway*, 98 F.3d 1195 (9th Cir. 1996); *Seattle-First v. F/V Lady Lynne*, 1995 WL 464536 (D.Ak. 1995); *Triventure Investment, Inc. V. M/V Midas*, 1995 WL 848520 (W.D.Wash. 1995). The vast majority of the cases involve only one or two trips in total. *TCW Special Credits v. Chloe Z,* supra; *Bjornsson v. U.S. Dominator, Inc.*, 863 P.2d 235 (Ak. 1993); *Do v. Ocean Peace, Inc.*, 2002 WL 1020670 (Wash.App. 2002). Nearly all of the cases appear to involve claims made within one year of the fishing voyages at issue, and in most cases within months. *Harper v. U.S. Seafoods L.P.*, 2001 WL 1428364 (W.D.Wash. 2001); *TCW Special Credits v. Chloe Z Fishing Co.*, Inc., supra.; *Miller v. Arctic Alaska Fisheries Corp.*, 944 P.2d 1005 (Wash. 1997); *Chirrick v. F/V Sharon Lorraine*, 1996 WL 263242 (W.D.Wash. 1996). In short, no other case interpreting §10601 and §11107 involves the grossly inequitable circumstances in the case at bar, resulting from plaintiffs' delay.

### C. DOUBLE WAGE PENALTY CASE LAW UNDER §10313.

Both plaintiffs and defendants have made analogy to the penalties of 46 U.S.C. §10313 and the cases addressing the defense of laches. Plaintiffs contend that the caselaw is distinguishable because the penalties that accrue under §10313 are greater. Defendants contend that they are analogous with respect to the laches analysis because, unlike §11107, §10313 inherently involves a finding of bad faith, and therefore requires a higher standard of culpability for a defendant.

Cases have denied relief to seamen under §10313 where there was a bona fide dispute as to the seaman's entitlement or the violation was due to an honest mistake. *Collie v. Fergusson*, 281 U.S. 52 (1930) (no liability under §10313 where refusal to pay is in some reasonable degree morally justified); *McCrea v. United States*, 294 U.S. 23 (1935) (No right to recover double wages where delay in payment of wages was not arbitrary, willful, or unreasonable); *The Velma L. Hamlin*, 40 F.2d 852 (4th Cir. 1930) (good faith withholding of wages does not subject vessel to double wage penalty); *Vinieris v. Byzantine Maritime Corp.*, 731 F.2d 1061 (2nd Cir. 1984); *Rush v. Isbradntsen Co.*, 98 N.Y.S.2d 508 (NY 1949) (Only arbitrary, unwarranted, and unjust conduct is sought to be penalized in §10313); *The A.I. Baker*, 76 F.2d 871 (6th Cir. 1935) (where owner does not know of claim for wages due, there is sufficient cause for delay).

Although the penalty itself may involve more money than §11107 in some circumstances, the need for a finding of bad faith is written right into the statute and therefore provides greater protection to defendants. Defendants in this case do not have the benefit of a statutory good faith defense, except in the context of laches. Therefore, the defense of laches should be equally applicable to a §11107 action.

Courts have barred numerous claims for double-wages under §10313 pursuant to the laches defense with regard to the presence of bad faith. *Chretien v. Exxon Co., U.S.A.*, 701 F.Supp. 266, 271 (D.N.H.), aff'd, 863 F.2d 182, 184 (1st Cir.1988)

(allowing application of doctrine of laches for unexplained two-year delay in seaman's wage case); *The Oliver Ames*, 178 F. 740 (D.C.Me. 1910) (seamen must act promptly to enforce a claim for wages in order to recover penalty); *Ventiadis v. C.J. Thibodeaux & Co.*, 295 F.Supp. 135 (S.D.Tx. 1968) (Plaintiff is required to exercise diligence in pursuit of claim to be entitled to double wage penalty. "Balancing the equities, the court believes that with due diligence the case could have been filed and the trial held much earlier.")

Even in the well known case *Guenther v. Sedco, Inc.*, 866 F.Supp. 786 (S.D.N.Y. 1998), in denying summary judgment to defendants, the court relied on the existence of "egregious fraud" on the part of the vessel owners in withholding payment of 10% of the claimants' pay for the payment of foreign taxes that were not due and did not actually exist. Those are not the facts in the case at bar to say the least.

### D. PLAINTIFFS' DAMAGES CALCULATIONS DISREGARD THE LANGUAGE OF §11107 AS WELL AS THE NATURE OF THE LAY SHARE SYSTEM.

To calculate their alleged damages, the plaintiffs retained accountant Lipeng He. Mr. He testified, and his calculations clearly show, that he did nothing more than take the dollar amount paid to each plaintiff for each trip and subtract it from the highest amount paid to a crewman for the same trip, regardless of skill or experience. As Mr. He stated, he did not take into account the "rate" paid to each crewman or the highest "rate" paid from the Port of Davisville or on these two vessels. Rather, his calculation of damages is nothing more than simple addition and subtraction.

Defendants introduced calculations prepared by bookkeeper Joann Greene, which represented the amount each plaintiff would have received if each crewman had been paid a full share, the highest "rate" of wages paid to any crewman. Obviously the two calculations (for the sake of clarity, the two different methods will be referred to as

the "He calculation" and the "Boat calculation") result in far different amounts for total damages under 46 U.S.C. §11107. Which is correct is a matter of first impression, since the issue has never been addressed by any other court in the United States.

In the merchant marine, to which this statute solely applied for two centuries prior to 1988, this meant that a member of a certain rank was entitled to the highest rate paid to a seaman of the same rank sailing out of the same port, for the duration of the voyage at issue. Since merchant mariners were and continue to be paid on a per diem or per hour basis, the length of the voyage multiplied by the highest daily wage rate made for an easy calculation.

Applying the same statute to share-based seamen is not so easy. Except for the captain and perhaps an engineer, are all crewmen the same "rank" no matter how experienced? Is an inshore lobsterman entitled to the same as a crewman on an offshore squid trawler? If a boat has a busted trip (costs exceed the value of the trip), is a crewman entitled to the highest amount paid to a crewman on the boat next to it that had a blockbuster trip?

The first step is to apply the plain language of the statute. §11107 states:

> An engagement of a seaman contrary to a law of the United States is void. A seaman so engaged may leave the service of the vessel at any time and is entitled to recover the highest rate of wages at the port from which the seaman was engaged or the amount agreed to be given the seaman at the time of engagement, whichever is higher.

As both this court and the First Circuit acknowledged in the case at bar, §11107 applies a "statutory default wage" in place of void contracts. *Doyle, et al. v. Huntress, et al.*, 301 F.Supp.2d 135, 148; *Doyle, et al. v. Huntress*, et al., 419 F.3d 3, 5 (1st Cir. 2005). As the Ninth Circuit most recently put it: "We have said that section

11107 'provid[es] a *statutory default to prevailing market wage* in the case of an invalid contract.'" *Flores v. American Seafoods Co.*, 335 F.3d 904 (9th Cir, 2003), quoting *Harper v. United States Seafoods*, 278 F.3d at 977. (emphasis added)

The purpose of the statute itself is to protect a seaman from a defense of desertion. It is not meant to provide a draconian penalty, but rather, to insure that a seaman gets paid for his service on the vessel, however short, if he chooses to leave the vessel because his contractual rights are not secure because of an invalid agreement. The highest rate language provides a gap-filler for his compensation. If Congress had intended to impose a true penalty in §11107, they would have used the civil penalty payable to the government applicable to coastwise vessels in 46 U.S.C. §10504.

Rather than providing a default rate, the plaintiffs are attempting to exact a windfall by asking this court to apply the highest wage paid to any crewman. This provides a far greater benefit than that enjoyed by the merchant mariner throughout the statute's two hundred year history.

The only valid way to calculate plaintiff's default wage is to evenly divide the total crewshare among the total number of crewmen on each trip. This represents the value of the highest rate and satisfies these plaintiffs' purported expectations, that all crewmen were to receive the same share.[7] In fact, all of the cases decided in the Ninth Circuit involved entire crews, not just a few crewmen, since in most of those cases none of the crewmen had been paid due to the boats' bankruptcies. Operating under the lay share system as do all fishing vessels, everyone on the crew would be paid the same amount. i.e., the "highest rate."

Calculating the damages under the He method results in absurdity because the

[7] It also takes into account the fact that none of their fellow crewmen were provided agreements setting forth a particular share and therefore could potentially come forward and make their own claims.

calculation of damages will change in any given case depending on how many partial shares are paid. A "default wage" should not change based on how many crewmen are involved in the underlying claim. It should always be the same. This problem illustrated in the following example.

**Example**: Two boats of equal size. Two crewmen and one captain on each. Total crewshare for each is $24,000. Boat A sets out with a 20 year veteran and a novice. The veteran receives a full share and the novice receives a half share. Boat B sets out with a 20 year veteran who receives a full share and a second crewmen, of several years experience, who receives a 7/8 share.

On Boat A, the 20 year veteran receives $16,000 with the novice getting $8,000 for his half share. On Boat B, the full share man receives $12,800 while the 7/8 share man receives $11,200.

If both crewmen receiving the one-half and seven-eighths shares file suit under §11107, what will they demand? According to plaintiffs, the half share man on Boat A would be entitled to a full $8,000 to bring him up to a total of $16,000. However, the seven-eighths share man on Boat B would receive $1600 to bring to a total of just $12,800.

| **Boat A** | | **Boat B** | |
|---|---|---|---|
| **Full** Share | $16,000 | **Full** Share | $12,800 |
| **Half** Share | $8,000 | **7/8** Share | $11,200 |
| | $24,000 | | $24,000 |
| §11107 recovery: | | §11107 recovery: | |
| HE Calculation | **$16,000** | HE Calculation | **$12,800** |
| Boat Calculation | $12,000 | Boat Calculation | $12,000 |

Under the He calculation, two boats bringing in the same catches, at the same port, with the same number of crewmen, must pay vastly different amounts under

§11107 to the half share man and 7/8 share man respectively. This is an absurd result because damages would depend only on how inexperienced or unskilled the rest of the crew was on each particular trip. Recovery would have nothing to do with the "highest rate of wages at the port," nor with a default to the prevailing market wage. The He calculation does not provide a "statutory default" to the "prevailing market wage." It provides a default to the highest wage paid on the boat. If a 30 year veteran crewman receiving a full share fishes with a novice crewman getting a half share, does the novice get paid double the amount for a violation of §11107 simply because his lack of experience entitled him to a half share pay, thereby maximizing the value of the full share?

A "default" rate to a prevailing market wage must be a static figure applicable to all persons. Therefore, the proper way to calculate damages under §11107 in the above example, would be to split the crewshare in half according to the Boat calculation propounded by defendants.

Therefore, to the extent the court deems them entitled to any compensation, their retroactive full shares must be adjusted according to the Boat calculation as set forth in defendants' Exhibits BB through FF.

## IV. PLAINTIFFS ARE NOT ENTITLED TO ATTORNEYS' FEES

Even assuming the plaintiffs prevail, there is no basis to award attorneys' fees. The general rule in admiralty is that "attorneys' fees are not available unless a party has acted in bad faith in the litigation itself." *Templeman v. Kris Kraft Corp.*, 770 F.2d 245, 250 (1st Cir. 1985). More specifically, the court's power to grant attorneys' fees in the context of a failure to pay wages to seamen can only be exercised when the employer has acted arbitrarily, recalcitrantly, or unreasonably. *Madeja v. Olympic Packers, LLC*, 310 F.3d 628, 635 (9th Cir. 2002). Therefore, in order to justify an

award of attorneys' fees in a seaman's wage claim, the ship owner must be determined to have acted with intentional dishonest or recalcitrance. *Id.* As the defendants have shown during trial, the defendants paid the plaintiffs the shares to which they were entitled for the work they performed. The defendants' misstep was in failing to put the compensation system in writing. This was not borne of bad faith in any form. *Id.* citing *Vaughan v. Atkinson*, 369 U.S. 527 (1962).

Conversely, the plaintiffs themselves have acted in bad faith throughout this litigation by fabricating their contention that they did not know about partial shares. Defendants have shown that plaintiffs have misrepresented their knowledge in an attempt to gain a windfall from the defendants. An award of attorneys' fees to the defendants, even assuming the plaintiffs, or any of them, prevail, is appropriate since they have acted in bad faith, and in wanton disregard for the interest of justice and this court. *Manuel Int. S.A. v. Rascator Maritime S.A.*, 782 F.2d 329 (2nd Cir. 1986); *Pan American Grain Manufacturing Co., Inc. v. Porto Rico Ports Authority*, 295 F.3d 108 (1st Cir. 2002). (Attorneys' fees granted where abusive and shameful discovery practices resulted in expenditure of unnecessary time and resources.) Therefore, defendants are entitled to their attorneys fees from the plaintiffs for the fees and expenses incurred in simply attempting to show that the plaintiffs knew about the partial share system. If the plaintiffs had simply stated that now obvious fact from the beginning, most of the time and expense of this litigation would have been avoided.

## V. PLAINTIFFS ARE NOT ENTITLED PREJUDGMENT INTEREST

Again, even assuming plaintiffs prevail on any part of their claim, they are not entitled to an award of prejudgment interest. In admiralty, trial courts have broad discretion in awarding prejudgment interest, including the rate and date of accrual. *Cottrill v. Sparrow, Johnson and Ursillo, Inc.*, 100 F.3d 220, 225 (1st Cir. 1996).

However, prejudgment interest in admiralty is generally awarded only for economic harm resulting from the defendants' use of funds to which the plaintiff is ultimately judged entitled, "but which the defendant had the use of prior to judgment." *U.S. v. Rafael*, 349 F.Supp.2d 84 (D.Mass. 2004). Obviously, in this case, defendants did not make use of any of the funds to which plaintiffs claim entitlement. Rather, as stated above, all "full share" compensation that the plaintiffs seek, has resided in the hands of their able, more experienced and more worthy fellow crewmen. It cannot be over emphasized that defendants did not gain financially in any way from their violation of 46 U.S.C. §10601.

While it is generally true that prejudgment interest can be awarded for certain economic damages in the discretion of the trial judge, there are a number of circumstances that make an award of interest unjust and inequitable. These include:

> 1) an improper delay of the action caused by the plaintiff; 2) a genuine dispute over a good faith claim in a mutual fault setting; 3) equitable considerations which caution against an award; and 4) a damage award substantially less than that claimed by the plaintiff. *George v. Kramo Ltd.*, 796 F.Supp. 1541 (E.D.La.,1992).

Most importantly, the plaintiffs have caused nothing but delay and a dramatic increase of the costs of litigation by their lack of truthfulness. Nearly all of defendants' efforts in discovery was to simply get plaintiffs to admit their attendance on the trips at issue and their understanding of the partial share system. Their avoidance and denial of these issues all the way through trial wasted unnecessary time and resources. Awarding interest on top of any damage award would essentially reward the plaintiffs for acting in bad faith.

Each of these factors is present in the case at bar. The plaintiffs' delay in filing

suit is extreme and unexplained. Defendants have an exceedingly meritorious defense of laches arising from the delay. Should defendants prevail even in part, plaintiffs will receive far less than their demand of $180,000. *Mecom v. Livingston Shipbuilding Co.*, 622 F.2d 1209 (5th Cir. 1980) (Recovery of amount substantially less than that demanded supports denial of prejudgment interest). Finally, the defendants, though remiss in failing to comply with §10601, were not acting in bad faith in doing so.

## VI. CONCLUSION

Because defendants have shown the three elements of their defense, ultimately based on laches: That the plaintiffs knew of their compensation all along; Defendants did not violate §10601 in bad faith; and, defendants have been prejudiced by plaintiffs unexcused delay; defendants are entitled to judgment against the plaintiffs on each of their claims. The plaintiffs were all well aware of the compensation system on these vessels from the inception of their employment, and likely before. They have come to this court in bad faith, claiming ignorance of their partial shares. They now ask this court to assist them in reaping the benefits of their feigned ignorance. Accordingly, defendants are entitled to judgment based on the defense of laches.

To the extent the plaintiffs are deemed entitled to any recovery, defendants would suggest that damages for retroactive full shares must be calculated according to the *Boat calculation* as described above and specifically set forth in Defendants' Exhibits BB through FF, as well as in light of any time limitation deemed appropriate under the laches analysis and the two year limitation.

Respectfully Submitted,
DEFENDANTS,
By Their Attorneys,

/s/ J. Renn Olenn, Esq.
J. Renn Olenn, Esq. #0623
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886
PHONE: (401) 737-3700
FAX: (401) 737-5499

/s/ Martin K. DeMagistris, Esq.
Martin K. DeMagistris, Esq. #6089
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886
PHONE: (401) 737-3700
FAX: (401) 737-5499

**CERTIFICATION**

I certify that I sent a true copy of the within on 9/21/06 to:

Merlyn O'Keefe, Esq.
Packer & O'Keefe
1220 Kingstown Road
Peace Dale, RI 02879

/s/ J. Renn Olenn, Esq.