**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| TIMOTHY DOYLE, ERIC EDWARDS, GREG HAGAMAN, BRIAN LAGUE, and ANTHONY RICHARDS | : | |
| PLAINTIFFS | : | |
| V. | : | C.A. NO. 01-409L |
| HUNTRESS, INC. AND RELENTLESS, INC. | : | |
| DEFENDANTS | : | |

**POST TRIAL REPLY BRIEF OF ALL PLAINTIFFS**

**FOREWORD**

If we who are involved in this case know anything, it is that Plaintiffs have won the liability component of this case, before not only this Court, but the Court of Appeals as well. Nonetheless, Defendants persist in pressing the issue of liability writing even this late that, "It would confound the defendants' compensation system for anyone but the captain to decide shares," *Defendant's Post Trial Memorandum* at 11, and continuing to whine about the unfairness of it all. *Id.* at 18, 19 n.1, 20, 31-33. Defendants are much like the Confederates who lost the Civil War but refused to accept their loss, to this minute devoting a section of their brief to distinguish this case from the "West Coast" cases, *Post Trial Memorandum* at 28. What Defendants fail to grasp is that: "In admiralty, law imposes a restraint on what normally on land may not be viewed as hard bargaining between employer and employee." See *Orsini* v. *O/S Seabrooke* 247 F. 3d 953 (9th Cir.) That effort is doomed since the law, thanks to this Court, is now recognized from coast to coast. Plaintiffs will pass up the bait to re-litigate decided issues

and leave Defendants where they stand and turn to the issues left in the case–the calculation of the pay differential, laches, interest, and attorney's fees. In so doing, they will respond to Defendants' arguments seriatim and by reference to the headings in their post trial brief as best they can.

## I. Even Assuming Arguendo, Plaintiffs Knew They Were Being Paid Less Than Others, This Knowledge Is Irrelevant–What Is Relevant Is When They Knew They Had a Cause of Action

### A. What Is Irrelevant

Plaintiffs are less than clear why Defendants go to such lengths to prove Plaintiffs knew they were being paid less than others, but do not concede they, in fact, proved it. Is it to establish an agreed upon share under the statute or is it to start the laches clock ticking? In either instance, the evidence, such as it is, is irrelevant. If offered to establish a contract, the claim for contract damages under 46 U.S.C. 10602 has been dismissed out of the case and there is nothing in the record to show the terms of any agreement. True enough, Mr. Richards wrote 7/8's on his gloves at one point to express his displeasure upon learning he was being paid less than others, but he never agreed to that amount in a statutorily compliant writing and, indeed, was shortly up to the highest share on 22 June 1998 (Exhibit 3 E-3) but was dropped down to a 7/8's share on 8 February 1999. *Id.* The long and short of it is that your Plaintiffs did not know what rate they would be paid from trip to trip and, for that matter, neither did the Defendants as Richard Goodwin set both the boat share and the captain's per as he pleased. *Trial Transcript* at 137 and 461. Indeed, Thomas Rawles who was called by the Defendants testified that Mr. Richards used to mock him as a newbie and brag that he made more than Mr. Rawles. Mr. Rawles got the message and testified reaching back to 1994, "I thought Tony was getting full share." *Trial*

*Transcript* at 337. So did Mr. Richards. While much effort wasted Plaintiffs' time, in proving Mr. Richards knew the other boat had more cycles and therefore more fish aboard, Trial Transcript at 246, this simply does not translate into Mr. Richards knowing what he was being paid in relation to his shipmates aboard the Relentless on any given trip. While he saw a settlement sheet before signing the release in an unrelated case Defendant Exhibit E, he saw it about "as fast as you can turn a page" *Trial Transcript* at 321 and had no chance to do any calculations.

Defendants then turn their attention to Plaintiffs Doyle and Lague making the same argument as against Richards: They had to have known they were being paid less than a full share as some sort of mandate of logic–not so. As Mr. Lague testified, he was interested in going aboard to match the income and lifestyle of his lifelong friend Mr. Richards he described as affluent *Trial Transcript* at 391 and in this regard Mr. Lague succeeded-- making some fifty thousand dollars a year *Trial Transcript* at 402–an amount he described as good money and so it appears compared to what he made in the odd jobs he held from 1998 to 1994 when he came aboard that they made more money aboard than they did in their prior shore-side jobs. *Trial Transcript* at 390

While Defendants note neither Hagaman nor Edwards testified via deposition, they were perfectly willing to, but Hagaman was in California when his deposition was first noticed and Edwards was in Utah. No substitute date was ever sought, no motion to compel was ever filed and it must also be noted that Edwards sat in the Courtroom throughout the trial under Defendants' subpoena but was never called. Despite what Defendants would have the Court believe, they were not ducking deposition or actual live testimony before the Court. While

Defendants seemed to enjoy themselves whacking the Plaintiffs around on non issues, the point must not be lost that this is a paper case and the Defendants have every scrap of paper they need to advance their rights.

When Plaintiff Richards testified at his profound disappointment and disbelief that others, "who did the same work as I do shoulder to shoulder" *Trial Transcript* at 274 were paid more, he spoke for all. Even if a lack of experience was a bar to the highest rate, these Plaintiffs certainly could not be held back for want of experience given the large number of trips they took, i.e. Doyle 37, Edwards 154, Lague 38, Richards 70.

**I. B. What Is Relevant**

While Defendants write tomes about these Plaintiffs having known they were being paid less than a full share, as this Court indicated: "The key point is when did they know they had a possible claim for these wages. That's the key point. And according to the testimony I have heard so far, it's a couple of months before suit was brought." *Trial Transcript* at 507. In so ruling, the Court most obviously relied on the case of *Halstead* v. *Grinnan* 152 U.S. 412 ( ) which held, "There must have been knowledge on the part of plaintiff of the existence of the rights for there can be no laches in failing to assert rights of which a party is wholly ignorant and whose existence he had no reason to apprehend." The earliest date these Defendants could be charged with knowledge was when, "In 2000 Plaintiffs attorney, while reviewing settlement sheets for unrelated litigation, noticed defendants were paying their crew members differing amounts of pay per trip for the same work and that no written agreements were executed prior to embarkation documenting the exact terms of each fisherman's wage or share as required by 46 U.S.C. 10601. *Slip Opinion* at 7-8. As Plaintiff Richards testified he learned of his

underpayment in the discovery phase of a Jones Act claim he brought in February 2001. However, the details and magnitude of these under payments could not have been apprehended until Defendants provided the settlement sheets and statutorily required accounting under 46 U.S.C. 10602 which were forwarded to Plaintiffs by Defendants on 15 October 2001 as to Doyle Ex. 3 A-1, Hagaman Ex. C-1, Lague Ex. 3 D-1, Richards 3 E-1, and on 22 March 2002 as to Edwards Ex. 3 B-1 who was permitted to join this case on an amendment to the complaint, at the earliest.

However, until this Court granted Plaintiffs' partial summary judgment on 13 January 2004, Plaintiffs had nothing more than pipe dreams as to ever securing back pay on a cause of action never in this District or Circuit prior to this Court's grant of partial summary judgment on 13 January 2004. The capture of this knowledge was no easy matter–first they had to learn a fishing agreement was required in writing before they left port, that the ones, and not all plaintiffs signed an agreement, that were signed complied with the several various requirements of 46 U.S.C. 10601 and that they were paid less than others performing the same task.

It screams volumes that Defendants did not touch this issue at trial or in its post trial brief. This tack is easily understood in light of both Richard Goodwin's *Trial Transcript* at 130-131 and Ms. Greene's testimony that they never told Plaintiffs of this right, never instructed anyone to tell Plaintiffs of this right or heard that the deck hands had ever been informed of this right. *Trial Transcript* at 69-70. While Mr. Richards testified he learned the statutory rights he now presses in "The middle of October 2001" *Trial Transcript* at 314, he is obviously mistaken given that the instant complaint was filed on 31 August 2001. This Court had it right when it found 2000 to be the correct date in its *Slip Opinion* at 7-8. In this same vein, Plaintiff Lague

testified that the instant complaint was filed within a couple of months after he learned he had a potential cause of action. *Trial Transcript* at 404.

## II. Defendants Are Not Entitled To Judgment Based On The Defense Of Laches

Defendants push this phase of their post trial brief denying that they did not violate the written agreement statute willfully, intentionally, or in bad faith but cite no legal authority for this self-aggrandizing pat on the back. Critically, neither U.S.C. 10601 nor 46 U.S.C. 11107 nor any case construing them of which Plaintiffs are aware speak to exculpatory language such as willful, intentional, or in bad faith. Defendants cut this argument out of whole cloth.

Richard Goodwin testified that he knew these agreements were required for all crew members as far back as June of 1993 *Trial Transcript* at 125 but, nonetheless, neither Hagaman nor Richards signed any and the ones signed by Doyle, Edwards and Lague were declared void under the statute by this Court.

The Defendants also press the argument that the under payments to these Plaintiffs were spread among other higher performing, in the Defendants' eyes, crew members. As has been established, the Defendants benefitted from the system by keeping this favored class of deck hands happy at these Plaintiffs' expense with their higher level of compensation. As Richard Goodwin testified the Defendants had an incentive to pay some deck hands more than other to retain them. *Trial Transcript* at 165 That is motive enough to short change these Plaintiffs.

Taken as a whole, this agreement is a return to the failed course in the liability phase of this case to put these vessels out of the reach of the statute which covers any fishing vessel

sailing from a port of the United States of more than twenty (20) gross tons 46.U.S.C. 10601 (a) (I) and (2) and to invoke the sympathy of the Court. This latter tack is clear as Defendants try to sneak it in to the record that, "These contract claims are not covered by insurance." *Defendants' Post Trial Brief* at 19, n.5. or so they say. Dropping this into a footnote is the only way to bring the claim to the Court's attention–under F.R.E. 411 which would not have been admitted into evidence at Trial.

There is a curious disconnect here: an insurance company gave them the forms that have exposed these Defendants to significant expense and damages, yet the Defendants have never implemented or third party complained against this insurer or their insurer's attorney who drafted these grossly flawed agreements.

This inaction mutes their claim of prejudice. They could make themselves whole if they chose by pursuing their carrier and eliminate any prejudice they claim. These Defendants have chosen to stand alone and take their chances in litigation rather than seeking an indemnity. Any prejudice they suffer is of their own choosing.

**II. A. The Doctrine Of Unclean Hands Does Not Require A Showing of Unconscionable Conduct**

In pressing the argument that unclean hands is unavailable to Plaintiffs, absent a showing of unconscionable conduct, Defendants rely on two trademark infringement cases from the District Courts of Massachusetts–one eleven years old and the other fifty-two years old and make not even the slightest attempt to analogize them nor do they cite any resort to the cited principles by a court of admiralty and Plaintiffs know of none.

Conduct no more than "inequitableness" will suffice *Precision Instruments Mfg. Co.* v. *Automotive Maintenance Machine Co.* 324 U.S. 806 (1945) as will conduct that is not more than tawdry *Texaco Puerto Rico, Inc*. v. *Dept. of Consumer Affairs 60* F.3d 867 (1st Cir. 1995). Then in a *non sequitur* Defendants turn and cite to the Court the cases of *Chretien* v. *Exxon Co. U.S.A.* 863 F.2d 182 (1st Cir. 1988) and *Pronav Charter II, Inc.* v. *Nolan 206* F. Supp. 2d 46, 54 (D. Mass 2002) for the proposition that "ignorance of the law is no excuse for either Plaintiffs or Defendants." *Defendants' Post Trial Brief* at 21. True enough that language is found in *Pronav*, but the case it cites for this rather tricky rule of law–*Chretien* simply does not contain that proposition. Quite to the contrary, "There must have been knowlege on the part of plaintiff of the existence of the rights for there can be laches no in failing to assert rights to which a party is wholly ignorant and whose existence he had no reason to apprehend." *Halstead* v. *Grinan* 152 U.S. 412. Indeed, in *Chretien*, the vessel owner had been dogging the seaman to square up with him financially–an overture he rejected.

## II. B. Even If The Most Analogous Statute Of Limitations Period For The Presumption Of Laches Is The Fair Labor Standards Act, Which It is Not--Defendants Waived Their Right To Invoke It

Defendants, as was developed in *Plaintiffs' Opening Post Trial Brief* and in opposition to Defendants earlier Motion to Reconsider the Analogous Statute of Limitations certified in November 2005, have waived any argument switch from the correctly decided ten year tipping point of *State* v. *Pellegrino*, 788 A.2d 1119 (RI 2002) to the Fair Labor Standard Act two year tipping point because their motion was grossly untimely. In addition, as will be shown directly,

the Fair Labor Standards Act is unavailable as a matter of substantive law.

Defendants in their *Post Trial Brief* at 22 and argue that while ignoring its limiting language as underscored below:

> Generally in choosing a limitations period for a federal claim, a court adopts the limitations period applicable to the most analogous state cause of action. [citation omitted] However, a federal limitations period may be used when a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking." (*Emphasis Supplied In All Three Instances*)

*Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson* 501 U.S. 350 (1991).

However, they do not make any attempt to address this limiting language and fail entirely to point out that, "...resort to state law remains the norm for borrowing of limitation periods." *Agency Holding Corp* v. *Malley, Duff and Associates* 483 U.S. 143 (1987)

Defendants rely on one decision of the Federal Court Southern District of New York that was reported only electronically on Westlaw *Brown* v. *The Royal Caribbean Cruises, LTD* 2000 WL 34449703 (S.D. N.Y). In *Brown*, the Court borrowed from the Fair Labor Standards Act 29 U.S.C. 255 (a) in selecting a three year statute as most analogous for these members of a seafaring labor union who, unlike your Plaintiffs, knew exactly what they were to have been paid through their collective bargaining agreement–all they had to do was look at it to see that it "set

out a specific pay scale to govern any overtime work performed in excess of the pre-agreed 'Guaranteed Overtime Hours' period of 60.62 hours per month." Too, there is an additional ground for setting the statute at three years: "Moreover, as the Court finds that this three year ⌊statutory⌉ period with the peculiar equitable circumstances of the case as it matches the three year limitations period specified by Norwegian law to which plaintiffs and defendants bound themselves in the agreement." *Id.* at 4 The Court also declined to cast its lot with these Courts who gave seamen a break in construing contracts between them and vessel owners because in regard to bargaining power, "The Court cannot presume such disparity where, as here, the seaman is represented by a Union that negotiated the contract on his behalf." While it may have been an appropriate choice there, it is not one here as those involved in the catching of fish are specifically exempted from the coverage of the statute 29 U.S.C. 213 (a) (5)! The case is further distinguishable in that it recognizes the Fair Labor Standards Act to impose a penalty wage in contrast to this Court's holding that 46 U.S.C. 11107 provides only a default wage, not a penalty wage. Clearly, no statute that specifically and unequivocally excludes fishermen such as these Plaintiffs can be considered analogous. Lastly, since there is no negotiated agreement as to a time bar in bringing suit, and there was a three year one in the *Brown* agreement, that fact in and of itself, provides a sufficient bar is to distinguish *Brown*. To continue with the analysis which permits a federal court to turn to a federal statute of limitations, the Defendants must further prove the federal policies at stake and the practicalities of litigation make the federal rule *significantly* more appropriate. They have not even tried to do so. If Congress wanted the statute of limitations in this sort of matter to be uniform, it could most easily have enacted such a law. Clearly, it has deferred to the states under the Rules of Decision Act and a decision by the

forum state's highest court falls under the act. _Commissioner_ v. _Estate of Boch_ 387 U.S. 456 (1967)

A judicial turn to the limitations period in the Fair Labor Standards Act is not more appropriate given the exclusion of fishermen from the statute and the fact that the _Brown_ plaintiffs were working under a published Collective Bargaining Agreement bars the time limits in the Fair Labor Standards Act from being an appropriate vehicle for interstitial lawmaking since it is neither significantly more appropriate than the rule of _Pellegrino_ v. _Rhode Island Ethics Commission_ 788 A.2d 1119 (2002).

Although Defendants persist in characterizing Plaintiffs' claim as penalty wages once again and even underscoring penalty in their _Post Trial Brief_ at 24, to this Court, 46 U.S.C. 11107 set a default rate not a penalty rate. Lastly, as has been previously briefed, the Defendants had ten days under F.R.C.P. 59 (e) to ask the Court to review its grant of partial summary judgment to Plaintiffs by its written Order of 13 January 2004 and were light years beyond that limit.

One last but telling difference, these vessels were non union and when one of your Plaintiffs worked a union job he knew what he was making under a collective bargaining agreement that was "all written in stone". _Trial Transcript_ at 392. The union worker stands in sharp contrast to these workers who were not given copies of the settlement sheets with their checks and their checks had no notations on them as to what percentage they received. _Trial Transcript_ at 55.

## II. C. The Plaintiffs Claims Should Not Be Barred by Laches

Defendants again tell the Court "ignorance of the law is no excuse and cannot overcome a laches defense" *Defendants' Post Trial Brief* at 24 and citing to *Chretien* v. *Exxon Co., U.S.A.* and *Pronav Charter II, Inc*. V. *Nolan* 206 F. Supp. 2d 46, 54 (D. N.H.) Affirmed 863 F.2d 182 (1st Cir. 1988) but the cited cases still do not stand for the proposition Defendants urge upon the Court.

Defendants plea to the Court to recognize: " There must be some reasonable time limit; some cutoff." *Id* at 25, but without any citation to law this can be seen as an admission that their laches defense has failed since it runs straight into the teeth of *Edelman* v. *Chase Manhattan Bank N.A.* 862 F.2d 1291 n.9 (1st Cir. 1988) which held that where defense of laches failed on a lack of a showing of prejudice, suit would precede even though Plaintiffs waited twenty-six years to file suit and were entitled to interest on top of the money they were owed! These Plaintiffs ask for no more.

Defendants claim the prejudice they incurred was a result of Plaintiffs running up the damages, but the wages Plaintiffs seek are linear default wages not the penal daily doubling of the unpaid wages *Chretien* and *Nolan* concerned themselves with. One of the cases cited by Defendants, the case of *Guenther* v. *Sedco* 1988 WL 898349 (S.D. N.Y.), makes the distinction between the impact on a ship owner of the penal wage withholding statute 46 U.S.C. 10313 and the default wage of 46 U.S.C. 11107. Under the former, on wages withheld from one plaintiff "from a single trip in 1986 were to be subjected to the statutory penalty, the withholding of $262.50 would result at over $850,000 in liability under the Wage Act." In sharp contrast, the vessel owners here would pay only the difference between what they paid in the first instance and what the law required them to pay in the first instance. Under the law, there is no prejudice in

paying what was owed in the first instance plus interest.

*Chretien* and the line of cases it flows into construe a statute 46 U.S.C. 10313 which does not, on its face, apply to fishing boats 46 U.S.C. 10313 (h) in the first instance and in the second instance contains an escape hatch for the vessel owner if it can prove sufficient cause for the non-payment under 46 U.S.C. 10313 (h) but no similar escape hatch is found in either 46 U.S.C. 10601 or 46 U.S.C. 11107.

Defendants misstate the law on under payments. A vessel owner's conduct in withholding wages does not have to fall to the level of duress, coercion, and/or deception to be actionable. An underpayment will generate penalty wages if it falls no lower than arbitrary willful and unreasonable." *McRea* v. *U.S.* 294 U.S. 23 (1935). Plaintiffs cannot conceive of anything more arbitrary than a vessel owner having the unbridled discretion to pay several crewmen a full share, others a seven-eights, others a three quarters and still others a half share and have the authority to pay a deck hand less a share on any given trip than he had previously received. Further evidence in just how arbitrary, willful, and unreasonable this share system is Mr. Goodwin's testimony that sometimes he set the boat share at 61%, sometimes at 63, and sometimes in between *Trial Transcript* at 137. Similarly, the first time around, Richard Goodwin boldly testified that the captains got full share plus 5% of the boat share *Trial Transcript* at 163 but when he actually crunched the numbers of Trip 552, he testified the Captain's per was 3 ½% *Trial Transcript* at 447. The point is that nobody knows who will get paid what–not even the chief executive of both companies!

**II. D. The Cases Cited by Defendants for the Prejudice Component of Laches Are Distinguishable**

Defendants cite two cases for the proposition that they suffered prejudice sufficient to carry their laches defense. Not so say Plaintiffs.

Each of these cases is distinguishable first as a matter of law–the Plaintiffs were merchant seamen and brought suit to recover a penalty for unpaid wages under 46 U.S.C. 10603 in contrast to these fishermen who brought suit under the wage default statute 46 U.S.C. 11107. Additionally, in both cases cited by Defendant, those Courts which recognized the laches defenses did so after already ruling for the vessel owners judgment on separate grounds. In both cases on which Defendants rely, *Chretien* and *Nolan*, each Court had ruled Defendants were entitled to judgment before reaching the question of laches and did so only as a back stop. In *Chretien* v. *Exxon U.S.A.* 863 F.2d 182 (1st Cir. 1988) it was because "sufficient cause" for withholding it was found, thereby exonerating the vessel owner and in *Pronav II* v. *Nolan*, summary judgment was granted because the vessel was not even owned by the Defendant at the time of the alleged withholding. Thus, the recognition of the affirmative defense of laches was rank dicta in both cases.

In *Chretien* v. *Exxon Co. U.S.A.* 701 F. Supp. 266 (D. N.H. 1988) affirmed 863 F.2d 182 (1st Cir. 1988), a 54 year old vessel's officer and 23 year employee of Defendant attended a workshop in the summer of 1982 at the invitation of his employer, the vessel owner, and was advanced $700.00 to cover his expenses. To keep that advance, all he had to do was to file an accounting. When payroll did not receive the accounting after sixty days, it sent him a notice followed up by one every thirty days thereafter until March 29, 1983 when the vessel owner's

payroll supervisor sent a personal reminder to Plaintiff of his obligation which he followed up with a similar letter on April 29, 1983. When Plaintiff had not responded, his paycheck was docked the $700.00 he had previously been advanced. Although, the Court found for the vessel owner on "sufficient cause" and the case could have stopped there, it continued on and resolved the laches defense as a separate matter, likewise, adverse to Plaintiff.

In doing so, the Court relied on the following factors:

- "The Plaintiff did not respond to the notices because he had some familiarity with the law concerning seamen's wages and believed any alleged attachment of wages to be unlawful."
- "The evidence further depicted the conscientious efforts of the defendant in notifying the plaintiff of the necessity to submit an expense report so that the plaintiff would not have to remit the funds advanced."
- "The plaintiff was fully cognizant of the deduction as it was reported on his pay stub which accompanied the payment in issue."
- "It is additionally uncontested that after the funds were deducted, the plaintiff made no attempt to contact the defendant or register a complaint concerning the deduction prior to resorting to the judicial process."
- "The original withholding of $700.00 has now multiplied to (according to the applicable statute) an inordinate sum in excess of $600,000.00."

- "Since 46 U.S.C. 596 ⌊the predecessor of 46 U.S.C. 10603⌉ provides a penalty equal to two (2) days pay of wrongful withholding, it is obvious that the damage sought under the statute would have been minimal in comparison had the suit been promptly initiated."
- "...there is evidence that the excessive delay contributed to the inability of the defendant to produce certain documents germane to this action."

These bulleted quotations are taken exclusively from District Judge Loughlin's opinion which was affirmed in all aspects but summarily affirmed as to laches in two sentences–neither of which would appear to be of assistance to this Court.

Unlike *Chretien*, these Plaintiffs had no familiarity with the law and harbored no belief that they were entitled to the highest rate a deck hand on the same trip received. Also, unlike *Chretien*, who was told by his employer that his wages would be protected if he signed a voucher, these Plaintiffs were never given the opportunity to, or notice of, their entitlement to wages higher than they received if they were to sign a statutory fishing agreement. Further, as Joanne Green testified, Plaintiffs were not given copies of the settlement sheets with their checks and the checks did not carry any notation as to what percentage they received. *Trial Transcript* at 55.

Also, in distinction from *Chretien*, the original withholding has not morphed into a tidal wave. The same amount, plus interest, is due whether it was filed the day after or several years after the trip. Lastly, unlike here where Ms. Green and Mr. Goodwin testified they had

everything they needed to calculate the wage differential, in Chretien the vessel owner was unable to produce some germane documents.

The other case relied on by Defendants to carry the day on the prejudice prong of the laches defense is *Pronav Charter II, Inc*. V. *Nolan* 206 F. Supp. 2d 46 (D. Mass. 2002).

In this case the district court resolved claims against two separate vessels brought by Plaintiff, a member of the Marine Engineer's Beneficial Association, but since only one such claim-- that against the Taurus involved laches– only it will be discussed.

After some pretrial backing and filling Nolan's claim against the Taurus was based on its owner's failure to pay one day's wages on 11 October 1988 for work Nolan performed aboard the Taurus until May 25, 2000. Nolan's claim was for unpaid wages, the statutory penalty of two days wages for every day not paid, prejudgment interest and costs, and attorney's fees.

Although summary judgment was granted to all defendants for the 1988 voyage on the bases that none of them were involved and the Taurus was controlled by a separate, non-sued Defendant and the Court could have finished there, it went on to consider the laches defense.

The vessel owners sought to invoke laches on the basis that:

- Nolan was aware of the alleged pay deficiencies as early as 1988–twelve years prior to bringing suit.
- "...penalty wages have been accruing at an astronomical rate, which is highly prejudicial."
- "...ignorance of legal rights does not constitute a valid reason for delay."
- The vessel was not owned by defendant at the time

of the alleged underpayment.

The Court accepted the vessel owners arguments against the *pro se* seaman and held that, "Twelve years between the time when Nolan became aware of the factual basis of the claims in court is simply too long and ignorance of the law is not excuse."

Your Plaintiffs agree the case was correctly decided on its fact in all but one regard and this is its noting ignorance of the law is no excuse. Quite to the contrary, "There must have been knowledge on the part of plaintiff of the existence of the rights for there can be no laches in failing to assert rights of which a party is wholly ignorant and whose existence he had no reason to apprehend." *Halstead* v. *Grinnan* 152 U.S. 412 ( )

While the case as noted was correctly decided, it is distinguishable from that *sub judice* given that our Plaintiffs are not members of any seafaring union and were not aware they were underpaid until shortly before filing suit and claim a default wage, not a geometrically increasing penalty on top of their wage.

Accordingly, neither case, and no other was cited, propels these vessel owner's affirmative defense of laches. Defendants have long since lost sight of the law that, "Laches is much more than time. It is time plus prejudicial harm and the harm is not that one loses what he otherwise would have kept but that delay has subjected him to a disadvantage in asserting his claimed right or defense." *Guitterez* v. *Waterman S.S. Co.* 373 U.S. 206. The test of laches is prejudice to the other party. *Id.* "In order for laches to apply, the district court must examine whether plaintiff's delay in bringing suit was unreasonable and whether defendant was prejudiced by the delay." *Puerto Rican American Insurance Co.* v. *Benjamin Shipping* 829 F. 2d 281 (1st Cir. 1987) (Emphasis supplied)

**III. The Instant Case Is Not Distinguishable from the Cases On the West Coast in Any Meaningful Way.**

Defendants have already lost this issue. This Court and the Court of Appeals have previously rejected this invitation by following those cases and applying their construct of 46 U.S.C. 10601 and 11107 to protect the Plaintiffs in this very case.

**IV. C. Double Penalty Case Law Under 10313** (sic in *Defendants' Post Trial Brief*)

Defendants claim that since 46 U.S.C. 10313 will give a pass to a vessel owner who has "sufficient cause" for non payment of wages, and highlight that neither 46 U.S.C. 10601 nor 11107 contain similar language as to "require⌊s⌉ a higher standard of culpability for a defendant." *Post Trial Brief* at 29

This is not a fair read of the statute. If a fishing vessel owner withheld wages in violation of the law, it is liable and cannot mount the statutory defense which a merchant vessel owner can. Such owners of fishing vessels are, if you will, strictly liable most likely in light of the merchant mariners being in and represented by large and powerful unions. Defendants have it exactly backwards.

**V. Plaintiffs' Damage Calculations Are Sound And Do Not**

Defendants open this section by representing Plaintiffs' accounting expert Lipeng He stated he did not take into account the 'rate' paid to each crewman or the highest 'rate' paid from the Port of Davisville or on these two vessels," *Defendants Post Trial Memorandum* at 30 and do so without citation. In fact, Mr. He testified his calculations were based on the highest rate paid

to a crew member. *Trial Transcript* at 105 and 113. The first time on the stand, Ms. Green and Mr. Goodwin had no quarrel with Mr. He's methodology. In fact, both Mr. Goodwin and Ms. Green admitted it was precisely the same as Ms. Green's as is readily seen in the calculations she prepared for the statutory accounting. Ex. 3 A-9, 3 C-2, 3 D-2, 4, 5, and 3 E-2, 3 and 4.

The difference between Mr. He's analysis and the second, Ms. Greene's, is that Mr. He works off what was actually paid to the members of the crew on these boats fishing out of Davisville, Rhode Island, and Ms. Greene's calculations are based on what coulda', shoulda', mighta' been paid *Trial Transcript* at 501. In other words, sheer conjecture. While Defendants argue the Plaintiffs should receive no more than what they thought they were receiving i.e., an equal share *Defendants' Post Trial Memorandum* at 32, it is irrelevant what they thought they should receive or did receive in relation to other deck hands aboard. What is relevant is what they did receive in relation to other deck hands on board.

Defendants urge this Court to cut out of whole cloth a requirement that "A default rate to a prevailing market wage must be a static figure applicable to all persons." *Post Trial Memorandum* at 34 and advance its arguments that the highest rate a deck hand was actually paid out of Davisville on a given trip is less determinative of the "highest rate" delineated by statute than Defendants' *post hoc* justification of what the highest rate would have been if everyone was paid an equal share. Of course, as has been shown, the actual shares from boat to captain to deck hand were anyone's guess.

In a lay share setting, the highest rate paid any crew member is easily expressed as a percentage and that percentage is easily gleaned from the settlement sheets in evidence by dividing the highest rate paid any deck hand "Full Share" or 8/8's by the total amount available to

pay crew members "Crew Share". Calculations for each trip are run out in Rate Analysis Workpaper For Each Plaintiff attached to this memorandum. Thus, in the settlement sheet for Relentless Trip 523, (Exhibit C 1-15) (the trip chosen by Mr. He as the centerpiece of his testimony) the highest rate was the full share–$4,208.32 which, expressed as a percentage of the crew share, was 7.69% ($4208.32 ÷ $54709.12). When one takes the trip before, Relentless 552 (Exhibit C 1-14), the full share was $2,691.40 which expressed as a percentage of the crew share was 10.42%[1] ($2,691.40 ÷ $25,837.64) and when one takes the trip after, Relentless 524 (Exhibit C 1-16), the highest rate was the full share or $3,115.76 which expressed as a percentage was 8% ($3,115.76 ÷ $38,947.51).

When Richard Goodwin testified, he used settlement sheet Relentless 552 (Exhibit ___) as his centerpiece and the same analysis holds there as well. On 552, the full share was $4,014.88 which expressed as a percentage of the crew share was 8.33% ($4,014.88 ÷ $48,179.92). On 551 (Exhibit C 1-31), the full share was $3,169.20 which expressed as a percentage of the crew share was 8.43% ($3,169.20 ÷ $37,573.32) and on 553 (Exhibit C 1-33), the full share was $4,952.44 which expressed as a percentage was 8.33% ($4,952.24 ÷ $59,427.37).

While a static rate might be convenient and easier to deal with, the statute calls for no such thing; it calls for the highest rate paid and that is a full share, not an equal share and that full share is easily expressed as a percentage of the crew share as has been shown, and shown with a steady remarkable consistency. More precisely, in the Attachment to this memorandum, the

[1]Trip 552 had a small crew share and Mr. Goodwin obviously albeit arbitrarily bumped a full share up to 10.42 % to keep those deck hands he favored from becoming dissatisfied and walking up the dock.

highest rate paid any deck hand on trips on which Timothy Doyle was aboard "Full Share" expressed as a percentage of the crew share was 8.48%. *Id.* at 1 For the other Plaintiffs, this same figure was 8.44% for Eric Edwards *Id* at 3, 8.33% for Greg Hagaman *Id* at 4, for Brian Lauge 8.06% *Id.* at 5, and for Anthony Richards 8.3% *Id.* at 7.

When an average is taken of these figures, (8.48 + 8.44 + 8.33 + 8.06 + 8.37 ÷ 5) the highest rate was 8.33%. While the statute requires an on the spot, i.e. sailing port and time, analysis of rate which can be taken only from that particular trip your Plaintiff was on, these wage are provided as a verifier of Plaintiffs' and Mr. He's trip by trip analysis. (Ex. C 1-32)

## VI. Plaintiffs Are Entitled to Attorney's Fees

Plaintiffs agree that they come up empty on attorney's fees in the absence of bad faith on these vessel owners' part in this litigation as it must under *Templeman* v. *Kris Kraft Corporation* 770 F.2d 245, 250 (1st Cir. 1985). Here, Defendants scorched earth litigation tactics meet that test starting with the answer they filed on 15 October 2001—some 45 days after service–listing fourteen affirmative defenses–all of which Plaintiffs had to plumb. Once this Court made its decision granting Plaintiffs partial summary judgment, Defendants took an interlocutory appeal to the First Circuit under both 28 U.S.C. 1292 (a) 3 later withdrawn after Plaintiff, briefed it and 28 U.S.C. which Defendants pressed. After remand Defendants asked this Court to reconsider its grant of partial summary judgment on 28 November 2005–close to two years after this Court's decision which Plaintiffs also briefed at the time and today as

Defendants have devoted virtually unlimited resources to litigate an issue that was decided adversely to it by every court that has reviewed it, including our Supreme Court which

declined to review it *TCW Special Credits* v. *Chloe Z Fishing Corp* 129 F. 3d 1390 (9th Cir. 1997) *cert*. *denied sub nom* *Barandarian* v. *TCW Special Credits* 524 U.W. 952 (1998)

Although every court that has reviewed these issues has found the statutes plain on their face, Defendants have flooded these courts with an unnecessary flood of legislative history. This it has done when there has been no real chance of prevailing on the merits but only in prevailing in an expensive, time consuming war of attrition on non-funded defendants. Under this very heading, Plaintiffs persist in holding their course of bad faith writing: "As the defendants have shown during trial, the defendants paid the plaintiffs the shares they were entitled for the work they performed." Defendants Post Trial Memorandum at ____. Obviously, this Court and the First Circuit would be quick to disagree. Simply put where "As the result of the vessel owner's recalcitrance seamen are forced to have a lawyer and go to court to get what was plainly owed under laws that are centuries old," attorney's fees are to be awarded. *Vaughan* v. *Atkinson* 369 U.S. 527 (1962) This suit was filed fully five years ago and if this Court declines to award attorney's fees thereby putting some brakes on these Defendants, the case is guaranteed to be unresolved in another five years.

**VII. Plaintiffs Are Entitled to Prejudgment Interest.**

The award of prejudgment interest in an admiralty case is the norm and is designed to compensate Plaintiffs for the lost time value of money they are ultimately awarded. *Borges* v. *Our Lady of the Sea* 935 F.2d 436 (1st Cir. 1991).

While Defendants would lead the Court to believe interest should not be awarded because the Defendants did not have use of the funds prior to judgment., this would not be just because Defendants did indeed have use of these under payments prior to judgment–the use they chose

was to highly compensate some deck hands to gain their loyalty all to the financial and statutory detriment of your Plaintiffs.

## Conclusion

Plaintiffs ask judgment enter as prayed for as to the amount of damages set forth in their Opening Post Trial Brief and the affirmative defense of laches be denied and dismissed.

Respectfully submitted,
Plaintiffs, Timothy Doyle, Eric Edwards,
Greg Hagaman, Brian Lague, and
Anthony Richards
By their Attorney:

/s/Merlyn P. O'Keefe, Esq.
1220 Kingstown Road
Peace Dale, RI 02879
(401) 789-4850 phone
(401) 782-4210 fax
Ct. Reg. #2439
gmpokjr@yahoo.com

CERTIFICATION

I hereby certify that I mailed a true copy of the within, first class postage prepaid, on the 7th day of November 2006 to J. Renn Olenn, Esq., OLENN & PENZA, 530 Greenwich Avenue, Warwick, RI 02886.

/s/Merlyn P. O'Keefe, Esq.

# To Plaintiff's Post Trial Memorandum 11/06/2006

## Rate Analysis Workpaper for Tim Doyle

| Column A | Column B | Column C | Column D | Column E | Column F | |
|---|---|---|---|---|---|---|
| Exhibit Number | Trip Number | Vessel | Total Available To Pay Crew Members After Deduction = "Crew Share" | Highest Rate Of Wages Paid Any Deckhand = "Full Share" or "8/8's" | Highest Rate of Wages Paid Any Deckhand On A Specified Trip Expressed As a Percentage of "Crew Share" ( Column E/ Column D) | Note |
| C1-3 | 464 | **Persistence** | 59,648.85 | 4,869.28 | 8.16% | |
| C1-4 | 465 | **Persistence** | 43,690.43 | 3,460.57 | 7.92% | |
| C1-8 | 466 | **Persistence** | 60,875.72 | 5,021.76 | 8.25% | |
| C1-5 | 467 | **Persistence** | 148,518.64 | 11,648.48 | 7.84% | |
| C1-6 | 468 | **Persistence** | 110,660.92 | 9,417.92 | 8.51% | |
| C1-7 | 469 | **Persistence** | 92,962.04 | 7,004.00 | 7.53% | crew share was not available. Use the sum of total wag |
| C1-11 | 516 | **Relentless** | 36,951.09 | 3,284.52 | 8.89% | |
| C1-12 | 518 | **Relentless** | 48,400.30 | 4,815.00 | 9.95% | |
| C1-13 | 519 | **Relentless** | 27,478.75 | 2,655.84 | 9.67% | |
| C1-14 | 522 | **Relentless** | 25,837.64 | 2,691.40 | 10.42% | |
| C1-15 | 523 | **Relentless** | 54,709.12 | 4,208.32 | 7.69% | |
| C1-16 | 524 | **Relentless** | 38,947.51 | 3,115.76 | 8.00% | |
| C1-17 | 525 | **Relentless** | 77,921.18 | 6,111.44 | 7.84% | |
| C1-18 | 527 | **Relentless** | 57,617.54 | 5,487.36 | 9.52% | |
| C1-19 | 528 | **Relentless** | 34,144.36 | 3,176.16 | 9.30% | |
| C1-20 | 529 | **Relentless** | 53,616.99 | 4,987.60 | 9.30% | |
| C1-21 | 531 | **Relentless** | 45,611.82 | 3,966.24 | 8.70% | |
| C1-22 | 532 | **Relentless** | 59,769.46 | 5,372.48 | 8.99% | |
| C1-23 | 533 | **Relentless** | 77,154.03 | 7,094.56 | 9.20% | |
| C1-25 | 536 | **Relentless** | 12,454.39 | 1,037.86 | 8.33% | C1-24 No TD |
| C1-26 | 541 | **Relentless** | 52,639.04 | 4,049.12 | 7.69% | |
| C1-27 | 545 | **Relentless** | 39,029.12 | 2,864.48 | 7.34% | |
| C1-28 | 547 | **Relentless** | 39,582.87 | 3,104.48 | 7.84% | |
| C1-29 | 548 | **Relentless** | 57,816.46 | 5,795.20 | 10.02% | |
| C1-30 | 550 | **Relentless** | 38,641.22 | 3,769.84 | 9.76% | |
| C1-31 | 551 | **Relentless** | 37,573.32 | 3,169.20 | 8.43% | |
| C1-32 | 552 | **Relentless** | 48,179.97 | 4,014.88 | 8.33% | |
| C1-33 | 553 | **Relentless** | 59,427.37 | 4,952.24 | 8.33% | |
| C1-34 | 556 | **Relentless** | 63,128.06 | 5,124.20 | 8.12% | |
| C1-35 | 557 | **Relentless** | 65,982.85 | 5,498.55 | 8.33% | |
| C1-36 | 558 | **Relentless** | 63,174.58 | 5,210.24 | 8.25% | |
| C1-37 | 559 | **Relentless** | 59,435.19 | 4,901.84 | 8.25% | |
| | Total | | 1,791,580.83 | 151,880.82 | 8.48% | |



## Rate Analysis Workpaper for Eric Edwards

| Column A | Column B | Column C | Column D | Column E | Column F | |
|---|---|---|---|---|---|---|
| Exhibit Number | Trip Number | Vessel | Total Available To Pay Crew Members After Deduction = "Crew Share" | Highest Rate Of Wages Paid Any Deckhand = "Full Share" or "8/8's" | Highest Rate of Wages Paid Any Deckhand On A Specified Trip Expressed As a Percentage of "Crew Share" ( Column E/ Column D) | Note |
| C2-2 | 510 | **Relentless** | 18,697.79 | 1,802.16 | 9.64% | |
| C2-3 | 511 | **Relentless** | 20,371.33 | 1,963.44 | 9.64% | |
| C2-4 | 583 | **Relentless** | 35,293.73 | 3,715.12 | 10.53% | |
| C2-5 | 584 | **Relentless** | 39,223.32 | 3,565.68 | 9.09% | |
| C2-6 | 445 | **Persistence** | 89,950.48 | 8,669.92 | 9.64% | |
| C2-7 | 446 | **Persistence** | 86,146.79 | 7,921.52 | 9.20% | |
| C2-8 | 448 | **Persistence** | 8,721.01 | 872.00 | 10.00% | |
| C2-9 | 449 | **Persistence** | 19,694.29 | 1,921.36 | 9.76% | |
| C2-10 | 450 | **Persistence** | 23,897.12 | 2,514.96 | 10.52% | |
| C2-11 | 451 | **Persistence** | 72,413.79 | 5,172.41 | 7.14% | |
| C2-12 | 452 | **Persistence** | 68,587.22 | 5,542.40 | 8.08% | |
| C2-13 | 453 | **Persistence** | 57,961.98 | 4,780.32 | 8.25% | |
| C2-14 | 454 | **Persistence** | 35,392.28 | 3,370.64 | 9.52% | |
| C2-15 | 455 | **Persistence** | 50,910.09 | 4,543.52 | 8.92% | |
| C2-16 | 456 | **Persistence** | 91,303.44 | 7,608.56 | 8.33% | |
| C2-17 | 457 | **Persistence** | 29,670.55 | 2,218.32 | 7.48% | |
| C2-18 | 460 | **Persistence** | 36,670.97 | 2,818.57 | 7.69% | crewshare n.a - use total wages |
| C2-19 | 463 | **Persistence** | 29,276.16 | 2,252.01 | 7.69% | |
| C2-20 | 465 | **Persistence** | 43,690.43 | 3,460.57 | 7.92% | |
| C2-30 | 466 | **Persistence** | 60,875.72 | 4,821.76 | 7.92% | |
| C2-31 | 407 | **Persistence** | 73,136.19 | 5,625.83 | 7.69% | C2-32 is name list |
| C2-33 | 408 | **Persistence** | 8,067.16 | 620.55 | 7.69% | |
| C2-35 | 409 | **Persistence** | 82,069.87 | 7,059.76 | 8.60% | C2-34 is name list |
| C2-37 | 410 | **Persistence** | 65,592.15 | 4,733.40 | 7.22% | C2-36 is name list |
| C2-39 | 411 | **Persistence** | 129,676.88 | 11,526.80 | 8.89% | C2-38 is name list |
| C2-41 | 412 | **Persistence** | 157,114.32 | 12,723.75 | 8.10% | C2-40 is name list |
| C2-42 | 414 | **Persistence** | 49,185.64 | 3,895.84 | 7.92% | C2-43 is name list |
| C2-44 | 415 | **Persistence** | 43,625.57 | 3,561.20 | 8.16% | |
| C2-45 | 416 | **Persistence** | 51,038.49 | 4,253.00 | 8.33% | C2-46 is name list |
| C2-47 | 417 | **Persistence** | 15,251.39 | 1,370.88 | 8.99% | |
| C2-48 | 419 | **Persistence** | 55,431.89 | 5,217.00 | 9.41% | C2-49 is name list |
| C2-50 | 420 | **Persistence** | 50,768.86 | 4,198.97 | 8.27% | |
| C2-51 | 421 | **Persistence** | 51,158.78 | 4,497.44 | 8.79% | C2-52 is name list |
| C2-53 | 422 | **Persistence** | 49,821.87 | 3,985.68 | 8.00% | |
| C2-54 | 424 | **Persistence** | 63,549.22 | 5,351.44 | 8.42% | |
| C2-55 | 425 | **Persistence** | 62,221.08 | 5,131.60 | 8.25% | |
| C2-60 | 470 | **Persistence** | 47,095.79 | 4,651.36 | 9.88% | C2-56 to C2-59 represent trip 468, 469. no Eric E |
| C2-61 | 472 | **Persistence** | 60,103.65 | 6,008.96 | 10.00% | C2-62 is name list |
| C2-63 | 473 | **Persistence** | 44,153.35 | 5,272.00 | 11.94% | |
| C2-64 | 475 | **Persistence** | 24,086.30 | 2,502.40 | 10.39% | C2-65 to C2-69 represent trip 476, 477. no Eric E |
| C2-70 | 480 | **Persistence** | 35,788.88 | 3,368.32 | 9.41% | C2-71 is name list |
| C2-72 | 481 | **Persistence** | 39,280.57 | 4,134.72 | 10.53% | |
| C2-73 | 482 | **Persistence** | 42,687.00 | 4,065.36 | 9.52% | C2-74 is name list |
| C2-75 | 499 | **Persistence** | 46,541.83 | 4,003.52 | 8.60% | |
| C2-76 | 401 | **Persistence** | 61,722.62 | 5,367.12 | 8.70% | C2-77 is name list |
| C2-78 | | **Persistence** | 61,442.36 | 5,067.36 | 8.25% | C2-79, C2-80 |
| C2-81 | 404 | **Persistence** | 66,192.07 | 4,686.16 | 7.08% | |
| C2-82 | 405 | **Persistence** | 61,319.62 | 4,955.12 | 8.08% | C2-83 is name list |
| C2-85 | 446 | **Persistence** | 20,689.87 | 1,591.52 | 7.69% | C2-84 info n.a. C2-86 - name list |
| C2-87 | 447 | **Persistence** | 47,901.79 | 3,720.48 | 7.77% | C2-88 is name list |
| C2-89 | 448 | **Persistence** | 47,065.98 | 3,655.60 | 7.77% | C2-90 is name list |
| C2-91 | 449 | **Persistence** | 59,998.36 | 4,615.20 | 7.69% | C2-92 is name list |
| C2-93 | 455 | **Persistence** | 81,125.22 | 6,978.48 | 8.60% | |
| C2-94 | 457 | **Persistence** | 53,143.96 | 4,571.52 | 8.60% | C2-95 is name list |
| C2-96 | 458 | **Persistence** | 22,992.41 | 2,006.35 | 8.73% | crewshare n.a - use total wages |
| C2-97 | 464 | **Persistence** | 7,031.99 | 712.08 | 10.13% | C2-98 is name list |
| C2-99 | 465 | **Persistence** | 36,144.51 | 3,907.44 | 10.81% | C2-100 is name list |
| C2-101 | 466 | **Persistence** | 36,328.95 | 3,632.88 | 10.00% | C2-102 is name list |
| C2-103 | 467 | **Persistence** | 42,685.86 | 4,215.84 | 9.88% | C2-104 is name list |
| C2-105 | 426 | **Persistence** | 61,910.71 | 4,952.80 | 8.00% | C2-106 is name list |
| C2-107 | 427 | **Persistence** | 61,901.71 | 4,952.08 | 8.00% | |
| C2-108 | 428 | **Persistence** | 62,138.10 | 5,021.20 | 8.08% | |
| C2-109 | 429 | **Persistence** | 5,482.13 | 466.56 | 8.51% | C2-110 is name list |
| C2-111 | 432 | **Persistence** | 29,468.12 | 2,311.20 | 7.84% | C2-112 is name list |
| C2-113 | 433 | **Persistence** | 25,939.49 | 2,034.40 | 7.84% | C2-114 is name list |
| C2-115 | 434 | **Persistence** | 61,645.01 | 4,787.92 | 7.77% | |
| C2-116 | 435 | **Persistence** | 26,095.89 | 2,130.24 | 8.16% | |
| C2-117 | 436 | **Persistence** | 36,892.29 | 3,243.20 | 8.79% | |
| C2-118 | 437 | **Persistence** | 33,711.60 | 2,780.32 | 8.25% | |
| C2-119 | 438 | **Persistence** | 38,832.08 | 3,202.64 | 8.25% | |
| C2-120 | 490 | **Persistence** | 60,185.03 | 4,378.86 | 7.28% | crewshare n.a - use total wages |
| C2-121 | 491 | **Persistence** | 52,476.74 | 4,283.76 | 8.16% | C2-122 is name list |
| C2-123 | 492 | **Persistence** | 44,403.85 | 3,319.84 | 7.48% | |
| C2-126 | 494 | **Persistence** | 52,799.07 | 4,223.92 | 8.00% | C2-124, C2-125 represent trip 493 - No Eric E |
| C2-128 | 495a | **Persistence** | 2,090.19 | 165.52 | 7.92% | |
| C2-129 | 497 | **Persistence** | 40,835.62 | 3,512.72 | 8.60% | |
| C2-130 | 498 | **Persistence** | 44,403.34 | 3,861.00 | 8.70% | |
| C2-131 | 467 | **Persistence** | 148,518.64 | 11,648.48 | 7.84% | |
| C2-132 | 468 | **Persistence** | 110,660.92 | 9,417.92 | 8.51% | |
| C2-133 | 469 | **Persistence** | 87,252.85 | 7,004.00 | 8.03% | C2-134 is name list |
| C2-135 | 471 | **Persistence** | 102,196.58 | 8,094.72 | 7.92% | |
| C2-136 | 472 | **Persistence** | 89,468.98 | 6,882.16 | 7.69% | |
| C2-137 | 473 | **Persistence** | 95,890.20 | 8,619.28 | 8.99% | |
| C2-138 | 474 | **Persistence** | 90,541.23 | 8,138.48 | 8.99% | |
| C2-139 | 476 | **Persistence** | 50,522.75 | 4,254.56 | 8.42% | C2-140 is name list |
| C2-141 | 477 | **Persistence** | 48,109.83 | 3,736.64 | 7.77% | |
| C2-142 | 478 | **Persistence** | 33,830.41 | 2,879.12 | 8.51% | |
| C2-143 | 479 | **Persistence** | 71,923.00 | 6,186.88 | 8.60% | |
| C2-144 | 481 | **Persistence** | 73,289.80 | 5,922.40 | 8.08% | |
| C2-145 | 482 | **Persistence** | 75,232.52 | 6,204.72 | 8.25% | C2-146 is name list |
| C2-147 | 483/484 | **Persistence** | 53,051.11 | 4,613.12 | 8.70% | C2-148 is name list |
| C2-151 | 486 | **Persistence** | 55,154.76 | 4,644.56 | 8.42% | C2-149,150 represent trip 485 - No Eric E |
| C2-152 | 487 | **Persistence** | 61,098.61 | 5,039.04 | 8.25% | |
| C2-153 | 488 | **Persistence** | 42,378.30 | 3,390.24 | 8.00% | |
| C2-154 | 404 | **Persistence** | 66,192.07 | 4,686.16 | 7.08% | |
| | Total | | 5,068,504.32 | 427,968.83 | 8.44% | |

C2-145 TO C2-154 HAS BEEN INDEXED AS C3-145 TO C3-154


Eric Edwards
14.00%
12.00%
10.00%
8.00%
6.00%
4.00%
2.00%
0.00%
Rate
510
445
450
454
460
407
411
416
421
470
480
401
446
455
465
427
433
437
492
498
471
476
481
487
Trip
Eric Edwards
Average Rate
Calculated - 8.44%

# Rate Analysis Workpaper for Greg Hagaman

| Column A | Column B | Column C | Column D | Column E | Column F |
|---|---|---|---|---|---|
| Exhibit Number | Trip Number | Vessel | Total Available To Pay Crew Members After Deduction = "Crew Share" | Highest Rate Of Wages Paid Any Deckhand = "Full Share" or "8/8's" | Highest Rate of Wages Paid Any Deckhand On A Specified Trip Expressed As a Percentage of "Crew Share" ( Column E/ Column D) |
| C3-3 | 523 | Relentless | 54,709.12 | 4,208.32 | 7.69% |
| C3-4 | 524 | Relentless | 38,947.51 | 3,115.76 | 8.00% |
| C3-5 | 525 | Relentless | 77,921.18 | 6,111.44 | 7.84% |
| C3-6 | 527 | Relentless | 57,617.54 | 5,487.36 | 9.52% |
| C3-7 | 531 | Relentless | 45,611.82 | 3,966.24 | 8.70% |
| | Total | | 274,807.17 | 22,889.12 | 8.33% |



## Rate Analysis Workpaper for Brian Lague

| Column A<br>Exhibit Number | Column B<br>Trip Number | Column C<br>Vessel | Column D<br>Total Available To Pay Crew Members After Deduction = "Crew Share" | Column E<br>Highest Rate Of Wages Paid Any Deckhand = "Full Share" or "8/8's" | Column F<br>Highest Rate of Wages Paid Any Deckhand On A Specified Trip Expressed As a Percentage of "Crew Share" ( Column E/ Column D) | |
|---|---|---|---|---|---|---|
| C4-3 | 475 | Persistence | 63242.98 | 5,110.48 | 8.08% | |
| C4-6 | 528 | Relentless | 34144.36 | 3,176.16 | 9.30% | |
| C4-7 | 529 | Relentless | 53616.9 | 4,987.60 | 9.30% | |
| C4-8 | 531 | Relentless | 45611.82 | 3,966.24 | 8.70% | |
| C4-9 | 536 | Relentless | 12454.39 | 1,037.86 | 8.33% | |
| C4-10 | 537 | Relentless | 65016.33 | 5,253.84 | 8.08% | |
| C4-11 | 542 | Relentless | 63009.46 | 4,800.72 | 7.62% | |
| C4-12 | 543 | Relentless | 61250.5 | 4,287.30 | 7.00% | crewshare n.a. use total wage paid |
| C4-13 | 545 | Relentless | 39029.12 | 2,864.48 | 7.34% | |
| C4-14 | 546 | Relentless | 62159.97 | 4,827.92 | 7.77% | |
| C4-15 | 547 | Relentless | 39582.87 | 3,104.48 | 7.84% | |
| C4-16 | 550 | Relentless | 38641.22 | 3,769.84 | 9.76% | |
| C4-17 | 551 | Relentless | 37573.32 | 3,169.20 | 8.43% | |
| C4-18 | 552 | Relentless | 48179.92 | 4,014.88 | 8.33% | |
| C4-19 | 553 | Relentless | 59427.37 | 4,952.24 | 8.33% | |
| C4-20 | 556 | Relentless | 63128.06 | 5,124.20 | 8.12% | |
| C4-21 | 557 | Relentless | 65982.85 | 5,498.55 | 8.33% | |
| C4-22 | 558 | Relentless | 63174.58 | 5,210.24 | 8.25% | |
| C4-23 | 559 | Relentless | 59435.19 | 4,901.84 | 8.25% | |
| C4-24 | 561 | Relentless | 25186.68 | 2,238.80 | 8.89% | |
| C4-25 | 562 | Relentless | 45011.21 | 3,334.16 | 7.41% | |
| C4-26 | 563 | Relentless | 52964.41 | 4,074.16 | 7.69% | |
| C4-27 | 565 | Relentless | 135788.79 | 10,863.04 | 8.00% | |
| C4-28 | 568 | Relentless | 48990.45 | 3,468.32 | 7.08% | |
| C4-29 | 569 | Relentless | 57576.22 | 4,225.76 | 7.34% | |
| C4-30 | 570 | Relentless | 16919.75 | 1,208.48 | 7.14% | |
| C4-31 | 571 | Relentless | 3931.63 | 500.00 | 12.72% | |
| C4-32 | 572 | Relentless | 57965.82 | 4,780.64 | 8.25% | |
| C4-33 | 573 | Relentless | 48649.15 | 4,054.08 | 8.33% | |
| C4-34 | 581 | Relentless | 64704.34 | 4,792.88 | 7.41% | |
| C4-35 | 583 | Relentless | 27691.68 | 2,051.20 | 7.41% | |
| C4-36 | 584 | Relentless | 23972.79 | 1,809.20 | 7.55% | |
| C4-37 | 588 | Relentless | 41379.8 | 3,559.52 | 8.60% | |
| C4-38 | 590 | Relentless | 38765.73 | 3,132.56 | 8.08% | |
| | Total | | 1,664,160 | 134,151 | 8.06% | |



# Rate Analysis Workpaper for Anthony Richards

| Column A<br>Exhibit Number | Column B<br>Trip Number | Column C<br>Vessel | Column D<br>Total Available To Pay Crew Members After Deduction = "Crew Share" | Column E<br>Highest Rate Of Wages Paid Any Deckhand = "Full Share" or "8/8's" | Column F<br>Highest Rate of Wages Paid Any Deckhand On A Specified Trip Expressed As a Percentage of "Crew Share" ( Column E/ Column D) | Note |
|---|---|---|---|---|---|---|
| C5-5 | 517 | Relentless | 43,606.63 | 4,056.40 | 9.30% | |
| C5-6 | 518 | Relentless | 48,400.30 | 4,815.00 | 9.95% | |
| C5-7 | 519 | Relentless | 27,478.75 | 2,655.84 | 9.67% | |
| C5-8 | 520 | Relentless | 40,400.65 | 3,811.35 | 9.43% | |
| C5-9 | 521 | Relentless | 41,772.00 | 4,135.80 | 9.90% | |
| C5-10 | 522 | Relentless | 25,837.64 | 2,691.40 | 10.42% | |
| C5-11 | 523 | Relentless | 54,709.12 | 4,208.32 | 7.69% | |
| C5-12 | 524 | Relentless | 38,947.51 | 3,115.76 | 8.00% | |
| C5-13 | 525 | Relentless | 77,921.18 | 6,111.44 | 7.84% | |
| C5-14 | 526 | Relentless | 96,944.37 | 11,575.44 | 11.94% | |
| C5-15 | 526a | Relentless | 91,474.56 | 10,024.56 | 10.96% | |
| C5-16 | 528 | Relentless | 34,144.36 | 3,176.16 | 9.30% | |
| C5-17 | 529 | Relentless | 53,616.99 | 4,987.60 | 9.30% | |
| C5-18 | 531 | Relentless | 45,611.82 | 3,966.24 | 8.70% | |
| C5-19 | 534 | Relentless | 53,538.17 | 4,923.04 | 9.20% | |
| C5-20 | 535 | Relentless | 30,694.97 | 2,612.32 | 8.51% | |
| C5-21 | 536 | Relentless | 12,454.39 | 1,037.86 | 8.33% | |
| C5-22 | 537 | Relentless | 65,016.33 | 5,253.84 | 8.08% | |
| C5-23 | 538 | Relentless | 52,870.15 | 3,742.96 | 7.08% | |
| C5-24 | 539 | Relentless | 66,238.17 | 4,674.36 | 7.06% | |
| C5-25 | 540 | Relentless | 73,377.55 | 5,194.80 | 7.08% | |
| C5-26 | 542 | Relentless | 63,009.46 | 4,800.72 | 7.62% | |
| C5-27 | 543 | Relentless | 61,250.50 | 4,287.30 | 7.00% | crewshare n.a. use total wage paid |
| C5-28 | 544 | Relentless | 55,393.48 | 3,820.24 | 6.90% | |
| C5-29 | 545 | Relentless | 39,029.12 | 2,864.48 | 7.34% | |
| C5-30 | 546 | Relentless | 62,159.97 | 4,827.92 | 7.77% | |
| C5-31 | 547 | Relentless | 39,582.87 | 3,104.48 | 7.84% | |
| C5-32 | 550 | Relentless | 38,641.22 | 3,769.84 | 9.76% | |
| C5-33 | 551 | Relentless | 37,573.32 | 2,969.20 | 7.90% | |
| C5-34 | 552 | Relentless | 48,179.92 | 4,014.88 | 8.33% | |
| C5-35 | 553 | Relentless | 59,427.37 | 4,952.24 | 8.33% | |
| C5-36 | 554 | Relentless | 64,046.06 | 5,337.12 | 8.33% | |
| C5-37 | 555 | Relentless | 58,091.93 | 4,569.28 | 7.87% | |
| C5-38 | 556 | Relentless | 63,128.06 | 5,124.20 | 8.12% | |
| C5-39 | 557 | Relentless | 65,982.85 | 5,498.55 | 8.33% | |
| C5-40 | 558 | Relentless | 63,174.58 | 5,210.24 | 8.25% | |
| C5-41 | 559 | Relentless | 59,435.19 | 4,901.84 | 8.25% | |
| C5-42 | 560 | Relentless | 36,370.25 | 2,999.60 | 8.25% | |
| C5-43 | 564 | Relentless | 25,379.55 | 2,010.24 | 7.92% | |
| C5-47 | 565 | Relentless | 135,788.79 | 10,863.04 | 8.00% | |
| C5-44 | 568 | Relentless | 46,990.45 | 3,468.32 | 7.38% | |
| C5-45 | 569 | Relentless | 57,576.22 | 4,225.76 | 7.34% | |
| C5-46 | 570 | Relentless | 16,919.75 | 1,208.48 | 7.14% | |
| C5-48 | 571 | Relentless | 3,931.63 | 500.00 | 12.72% | |
| C5-49 | 572 | Relentless | 57,965.82 | 4,780.64 | 8.25% | |
| C5-50 | 573 | Relentless | 48,649.15 | 4,054.08 | 8.33% | |
| C5-51 | 574 | Relentless | 55,669.32 | 4,409.44 | 7.92% | |
| C5-52 | 575 | Relentless | 56,904.24 | 4,507.20 | 7.92% | |
| C5-53 | 576 | Relentless | 55,124.07 | 4,323.44 | 7.84% | |
| C5-54 | 577 | Relentless | 51,638.63 | 4,090.16 | 7.92% | |
| C5-55 | 578 | Relentless | 64,416.54 | 5,205.36 | 8.08% | |
| C5-56 | 581 | Relentless | 64,704.34 | 4,792.88 | 7.41% | |
| C5-57 | 582 | Relentless | 7,833.15 | 659.60 | 8.42% | |
| C5-58 | 583 | Relentless | 27,691.68 | 2,051.20 | 7.41% | |
| C5-59 | 584 | Relentless | 23,972.79 | 1,809.20 | 7.55% | |
| C5-60 | 586 | Relentless | 19,976.50 | 1,536.65 | 7.69% | |
| C5-61 | 587 | Relentless | 6,677.96 | 513.68 | 7.69% | |
| C5-62 | 589 | Relentless | 32,626.68 | 2,718.89 | 8.33% | |
| C5-63 | 590 | Relentless | 38,765.73 | 3,132.56 | 8.08% | |
| C5-64 | 590B | Relentless | 27,682.78 | 2,355.92 | 8.51% | |
| C5-65 | 591 | Relentless | 43,410.28 | 3,339.25 | 7.69% | |
| C5-66 | 592 | Relentless | 37,897.04 | 2,972.24 | 7.84% | |
| C5-67 | 593 | Relentless | 47,539.96 | 4,089.44 | 8.60% | |
| C5-68 | 593(2) | Relentless | 24,445.39 | 2,222.30 | 9.09% | |
| C5-69 | 596 | Relentless | 31,263.86 | 2,660.72 | 8.51% | |
| C5-70 | 597 | Relentless | 45,316.12 | 3,554.16 | 7.84% | |
| C5-71 | 598 | Relentless | 46,602.86 | 3,691.28 | 7.92% | |
| C5-72 | 599 | Relentless | 25,511.59 | 2,061.52 | 8.08% | |
| C5-73 | 500 | Relentless | 53,375.46 | 4,641.28 | 8.70% | |
| C5-74 | 503 | Relentless | 48,409.99 | 4,034.16 | 8.33% | |
| C5-75 | 506 | Relentless | 59,312.66 | 5,272.16 | 8.89% | |
| C5-76 | 507 | Relentless | 48,071.43 | 4,524.32 | 9.41% | |
| C5-77 | 508 | Relentless | 38,468.74 | 3,497.15 | 9.09% | |
| C5-78 | 509 | Relentless | 71,703.38 | 6,602.34 | 9.21% | crewshare n.a. use total wage paid |
| C5-79 | 510 | Relentless | 11,827.68 | 1,049.04 | 8.87% | crewshare n.a. use total wage paid |
| | Total | | 3,549,573.97 | 297,250.72 | 8.37% | |


A Richards
14.00%
12.00%
10.00%
8.00%
6.00%
4.00%
2.00%
0.00%
Rate
517
524
534
542
551
558
570
577
587
593(2)
506
Trip
Anthony Richards
Average Rate Calculated - 8.37%