UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

TIMOTHY DOYLE, GREG HAGAMAN,
BRIAN LAGUE, ANTHONY W. RICHARDS,
and ERIC EDWARDS,
    Plaintiffs,

v.                                    C.A. No. 01-409L

HUNTRESS, INC., AND RELENTLESS,
INC.,
    Defendants.

DECISION AND ORDER

Ronald R. Lagueux, Senior District Judge.

This case arises from a wage dispute between the corporate
owners of two commercial fishing vessels, the *FV Persistence* and
the *FV Relentless*, and several of the crewmen who once worked on
those boats.  In their complaint, Plaintiff crewmen allege that,
during the years 1993 through 2000, the ships' owners failed to
provide them with written wage agreements prior to their fishing
voyages, as required by 46 U.S.C. § 10601.  They further claim
statutory damages pursuant to 46 U.S.C. § 11107.  Plaintiffs'
complaint also included a claim for breach of contract which was
voluntarily dismissed during the discovery phase of this action.

**Travel of the case**

Plaintiffs and Defendants filed cross motions for summary
judgment which were heard by this Court in 2003.  As the basis
for their motion, Plaintiffs maintained that they were entitled
to judgment on their claims as a matter of law.  Defendants
argued that they had provided fishing agreements which complied

with 46 U.S.C. § 10601; that 46 U.S.C. § 11107 did not provide a
remedy for the claims; and that, at any rate, Plaintiffs' claims
were barred by laches and waiver.  Under this same caption, this
Court granted partial summary judgment in favor of Plaintiffs,
ruling that §§ 10601 and 11107 applied to Plaintiffs' claims, and
that the fishing agreements in use on the boats did not comply
with the statutory requirements.  This Court further determined
that there were disputed issues of fact concerning Defendants'
claims of laches and waiver, and so denied their cross motion for
summary judgment.  301 F. Supp. 2d 135 (D.R.I. 2004).

Defendants initiated an interlocutory appeal of the Court's
ruling to the Circuit Court, and Plaintiffs filed a cross appeal,
but the First Circuit affirmed this Court's ruling in toto, at
Doyle v. Huntress, Inc., 419 F.3d 3 (1st Cir. 2005). For a
thorough analysis of the maritime safety statutes, their history
and recodification in 1983, the reader is referred to the two
prior published decisions in this case.

These two decisions also explain in detail the factual
background of the present dispute.  Nonetheless, in the interest
of clarity, this background will be briefly recounted herein.

### Background

The *FV Persistence* (owned by Huntress, Inc.) and the *FV
Relentless* (owned by Relentless, Inc.) are 125-foot, steel-hulled
freezer trawlers, weighing in excess of 20 gross tons each.  They

-2-

are the only fishing boats operating out of the port at
Davisville, Rhode Island.  Plaintiff crewmembers were employed on
the boats between 1993 and 2000.  On the fishing expeditions
which are the subject of the litigation, each boat employed a
captain and an engineer, along with approximately twelve crewmen.
They fished along the New England and mid-Atlantic coastlines for
squid and other bait fish, on voyages of up to two weeks in
duration.  While one crewmember was usually designated the cook,
the crewmen shared in all other chores, which included setting
and pulling in the massive nets, maintaining the equipment,
keeping the boat ship-shape and serving on the assembly line by
which the fish was sorted, stacked and flash-frozen while the
boat was still out at sea.  The frozen fish was sold on the
boat's return, usually to a company called SeaFreeze which was
primarily owned by Richard Goodwin, also the primary owner of
Defendant corporations.

After the sale of the fish, Defendants deducted the trip's
expenses from the gross profits.  These expenses included the
cost of the food and other provisions consumed by the crewmen
during the trip, as well as fuel and the costs associated with
packaging and unloading the catch.  Next, between 58 and 63
percent of the net proceeds were paid to the ship owner.  The
remainder was divided amongst the crewmen using the time-honored
"layshare system."  According to the layshare system, the ship

-3-

captain determined each crewman's proper share based on his years
of experience and his performance on the voyage.  As this Court
wrote previously,

> No crewmember would be told before the trip
> exactly what percentage of the catch he would
> receive when the voyage was over, as this
> determination was left to the discretion of
> the captain, based on his perception of a
> seaman's work during the trip.  Generally,
> more experienced hands would perform better
> while out at sea, and thus would receive a
> larger share, while less experienced seamen
> would perform less optimally, and as a result
> receive a smaller share of the proceeds.
> However, the percentage, or "share" due each
> fisherman was left entirely to the captain's
> discretion, and no exact formula existed for
> determining the amount due each fisherman at
> the end of a voyage.

301 F. Supp. 2d at 138. In practice, the payment method did not
follow an entirely predictable pattern: while the rate paid to
some individuals increased incrementally over time; for some
others, it went up and then down again from trip to trip.

The layshare payment system has been the traditional system
in this sector of the fishing industry, and up-front written wage
agreements do not seem to have been the norm.  As early as 1792,
pre-trip written agreements were required in the cod fishing
industry, and this protection was extended to mackerel fishermen
in 1865.  Harper v. U.S. Seafoods LP, 278 F.3d 971, 974 (9th Cir.
2002).  In 1988, the Commercial Fishing Industry Vessel Safety Act
extended the requirement to cover all fishing vessels over 20

-4-

gross tons.  As codified by 46 U.S.C. § 10601, the individual in
charge of a fishing vessel is required to make a written fishing
agreement with each seaman before the voyage embarks, and the
agreement should include the compensation arrangement, among
other terms.[1]

As this writer explained previously,

> Mandating written contracts prior to
> embarkation merely fosters pre-voyage
> bargaining between the fisherman and the
> captain regarding what share of the proceeds
> a seaman is worth, and protects the fisherman
> from arbitrary discrimination by the captain
> once the voyage is underway.  This statutory
> interpretation levels the playing field for
> the seaman, ensuring more equal bargaining
> position between a fisherman and a vessel
> owner.

301 F. Supp. 2d at 144.

Defendants seem to have had some understanding that
something more was required of them than what had been their
practice in the past.  While many of the crewmen had oral
agreements with the ship owners, Defendants also had a form
agreement with blanks for share amounts, which they used as a
roster sheet on occasion.  The heading on these forms referenced
§ 10601, and the body of the form included the owners' policies
on crew safety.  The seamen were usually asked to sign the roster
forms before the trip, but the wage blanks were not filled in and

_____

[1] The statute was amended in 2002, but those changes became
effective after the dispute before the Court erupted.

-5-

the form was not signed by the ship owner, or any other
representative of Defendant corporations.  The oral agreements
and the various versions of the form Fishing Agreements used by
Defendants were all found to be in violation of § 10601 in the
Court's summary judgment ruling.  301 F. Supp. 2d at 144.

The Court also held that federal statute 46 U.S.C. § 11107
provides a remedy for Defendants' failure to comply with § 10601.
This companion statutory section states that the "engagement of a
seaman contrary to a law of the United States is void."  In the
absence of an enforceable agreement, the seaman may leave the
vessel at any time "and is entitled to recover the highest rate
of wages at the port from which the seaman was engaged or the
amount agreed to be given the seaman at the time of the
engagement, whichever is higher."  46 U.S.C. § 11107; 301 F.
Supp. 2d at 145.

In their cross motion for summary judgment, Defendants
raised the equitable defense of waiver, arguing that Plaintiffs
waived their right to contest their wages by accepting payment
for their services at the end of each trip.  In response,
Plaintiffs claimed that they were not aware that they were all
being paid different amounts for the same work, nor were they
aware that their informal employment arrangements were in
violation of federal law.  Because there were disputed issues of
fact concerning what the Plaintiffs knew and when they knew it,

the Court denied Defendants' motion for summary judgment on this
ground.

Defendants also raised the defense of laches in their cross
motion for summary judgment, asserting that Plaintiffs' claims
were barred because too much time had elapsed between the fishing
expeditions in question and the filing of the lawsuit.  Neither
the federal statutory section which requires up-front fishing
agreements, § 10601, nor the section which specifies the default
wage structure in the absence of a valid agreement, § 11107,
includes a time limitation for claims.  Consequently, an analysis
of the timeliness of these claims is governed by the equitable
doctrine of laches.  To undertake a laches analysis, the Court
must identify an analogous statute of limitations from federal or
state law to use as a benchmark.  <u>Puerto Rico Ports Auth. v.
Umpierre-Solares</u>, 456 F.3d 220, 227 (1st Cir. 2006).  In their
motion for summary judgment, Defendants urged the Court to adopt
the six month statute of limitation found in 46 U.S.C. § 10602.
Citing reasoning delineated by the Ninth Circuit in <u>Seattle-First
Nat'l Bank v. Conaway</u>, 98 F.3d 1195, 1198 (9th Cir. 1996), this
Court declined to adopt the six months statute of limitations.

On their side, Plaintiffs suggested that the Court use Rhode
Island's ten-year statute of limitations found in R.I. Gen. Laws
§ 9-1-13(a), the general state statute of limitations for all
civil actions arising under state law, excluding torts.  In

-7-

dictum when it ruled on the cross motions for summary judgment, the Court expressed preference for the ten-year statute.  301 F. Supp. 2d at 150.

After the Court's decision, Defendants filed a Motion for Reconsideration, requesting that the Court re-evaluate its position on the analogous statute of limitations.  Defendants proposed that the Court impose the two-year statute of limitations for wage claims found in the federal Fair Labor Standards Act, 29 U.S.C. § 255[2], or the three-year statute of limitations found in Rhode Island's statute on the payment of wages, R.I. Gen. Laws § 28-14-20.  At a hearing on January 12, 2006, the Court denied Defendants' Motion, stating that it was impossible to make a final determination as to the analogous limitations period prior to hearing the relevant evidence at trial.  For the purposes of the trial, the Court indicated, the burden would remain on Defendants to establish the laches defense.  The matter proceeded to trial in May 2006.

## Findings of Fact

During the trial, testimony focused on three main areas of inquiry: whether or not Plaintiffs knew they were being paid differing, and less than full, shares during the period 1993 through 2000; the degree of transparency with which Defendants

---

[2] This section provides a three-year statute of limitations for willful violations of the Act.

-8-

implemented the layshare payments; and the way the layshare
payments were calculated.

At times, the preoccupation with what Plaintiffs knew and
when they knew it forced witnesses on both sides into positions
of scant credibility.  The crewmen testified that each only knew
about his own wages, that they never discussed their wages among
themselves, and that, to the extent they thought about their
wages, they assumed that everyone was being paid the same amount.
On the other hand, Defendants' witnesses testified about the
complete transparency that characterized their payment system.

Plaintiff Anthony Richards testified that he did not know
what other crewmen were paid and that he never asked any
questions about wages, even before he first signed up to work on
board the *FV Relentless*.  He testified further that it was
Defendants' policy not to allow the crewmen to see the expense
calculations for each trip, which were recorded on settlement
sheets labeled by boat name and trip number.

According to Richards, he first discovered that he was not
being paid a full share after he was injured in February 1998 on
board the *FV Relentless*.  During his recovery, he missed two
fishing trips.  In May 1998, Richards negotiated a compensation
settlement with the ship owner for the missed trips.  Several
years later, Richards began to think that the settlement had not
been advantageous.  He retained an attorney and, in February

-9-

2001, he challenged the settlement and the release in this
federal court.  During discovery for that lawsuit, he and his
lawyer obtained settlement sheets from Defendants for all of
Richards' trips.

Richards testified that, when he reviewed these settlement
sheets, he realized for the first time that he had not been paid
a full share for every trip.  The settlement sheets revealed
that, prior to his injury, he had received a 7/8 share; after his
injury, he received a full share; then his share went up and down
from 7/8 to full and back again until he retired from fishing.
At the same time, Richards and his attorney also determined that
Defendants' failure to provide the crewmen with written
agreements was probably a violation of federal law.  The present
lawsuit was filed on August 31, 2001. Richards testified at the
bench trial that he never discussed his wages with any of his
fellow crewmembers until after he discovered that he had not been
consistently making a full share.

Defendants called as witnesses several former and current
crewmen, who testified that discussions about wages were common
amongst the crewmembers, and that, though no one ever asked to
see the settlement sheets after a trip, they assumed they could
have seen them if they had wanted to.  Defendants' bookkeeper,
Joanne Gillan, testified that a few times crewmembers came to her
office and asked to see settlement sheets.  While the sheets were

available for review in her office, crewmen were not permitted to borrow them or make copies.

Defendants' witness, James O'Grady, a former crewmember, testified that he thought crewmen were permitted to go to the office to see the settlement sheets, although he never did it. As captain of his own vessel now, he distributes copies of the settlement sheets at the end of each trip.  Another witness for Defendants, former crewman Thomas W. Rawles, Jr., said that when he first started to work for the *FV Relentless* in 1993 or 1994, he remembers Richards bragging that he was a 'full share man' and made more money than Rawles.

While much time was spent at trial with testimony about the layshare system, these issues are actually of little relevance to the Court's laches analysis.  The system of paying crewmen differing amounts according to their experience and contribution is not illegal.  The more important issue is whether or not the crewmen knew that they had a statutory right to pre-trip written compensation agreements, pursuant to 46 U.S.C. § 10601.  On this pivotal issue, the Court finds that the crewmen did not know that they were entitled to written agreements until Richards' lawyer[3] informed Richards of this right during the course of Richards' first federal court lawsuit sometime in 2001.

---

[3] Richards' lawyer in his earlier lawsuit was Merlyn O'Keefe, who also represents Plaintiffs herein.

On the Defendants' side, although their representatives knew or should have known of the requirements of § 10601, the Court concludes that there is no evidence that those persons acted unconscionably or in bad faith in failing to provide the crewmembers with written wage agreements.  Accordingly, the Court finds that Defendants' hands are clean enough to permit them to invoke the laches defense.  *See* <u>K-Mart Corp. v. Oriental Plaza, Inc.</u>, 875 F.2d 907, 912 (1st Cir. 1989).

Several witnesses testified about the methodology employed to calculate the lay shares.  Richard Goodwin, Defendants' CEO, described the method he used to calculate settlements, which he learned from a fisherman's wife at the beginning of his fishing career in the late 1950s.  This method, called the broken share system, involved assigning shares to each crewman by factors of eighths, with each man getting anywhere between a 4/8 and a full share.  The numerators (that is, the top number in the fraction) would be added together and the net total of money would be divided by the total of the numerators.  The result was the amount of a 1/8 share.  The settlement sheets were entered as evidence during the bench trial and they show that, in some cases, crewmen were paid by factors of thirds, as well as eighths.

At the conclusion of the testimony, Plaintiffs moved the Court to render judgment in their favor on the issue of waiver,

pursuant to Federal Rule of Civil Procedure 52(c), arguing that, as wards of admiralty, they could not waive their right to a written wage agreement without full knowledge of that right, and that the waiver of a right to wages was against public policy in any event.   The Court concurred that there was no evidence that Plaintiffs knew that they were entitled to be provided with written wage agreements prior to embarking on the trips, so as to knowingly waive this right when they later accepted their share payments.   *See* <u>Garrett v. Moore-McCormack Co.</u>, 317 U.S. 239, 248 (1942).

Plaintiffs also moved the Court for judgment on the issue of laches.   The Court postponed a ruling on this issue, and requested a thorough briefing from both parties on laches, as well as on the issue of the analogous statute of limitations. Post-trial briefs were filed and now this matter is in order for decision.

### The doctrine of laches

In <u>Cities Service Oil Co. v. Puerto Rico Lighterage Co.</u>, 305 F.2d 170, 171 (1st Cir. 1962), the Court wrote, "A suit in admiralty is barred by laches only when there has been both unreasonable delay in the filing of the libel[4] and consequent prejudice to the party against whom suit is brought."   (Citing

---

[4] The word "libel" in admiralty, now out of use, meant commencing a lawsuit against a vessel by arresting it.

-13-

Gardner v. Panama R. Co., 342 U.S. 29, 31 (1951)).  In determining just what constitutes unreasonable delay and prejudice, much discretion is left to the trial judge.  Gardner at 30; Guerrido v. Alcoa Steamship Co., 234 F.2d 349, 358 (1st Cir. 1956).  Because of the discretionary nature of the two-pronged laches test, case law provides imprecise guideposts by which to chart the present course.

The analysis of the reasonableness of a plaintiff's delay in filing suit often focuses on the plaintiff's state of mind: did the plaintiff know of his or her rights, but negligently, or deliberately, fail to exercise them?  Was the delay excusable, and, if so, what was the excuse?  When a plaintiff knows of the cause of action, but fails to promptly pursue it, that is usually considered an unreasonable delay.  *See* Puerto Rico Ports Auth., 456 F.3d at 227; Chretien v. Exxon Co., U.S.A., 701 F. Supp. 266, 271 (D.N.H. 1988).

However, in the present case, the Court has found that Plaintiffs did not know of their rights under § 10601 when they went to sea on the various trips, and that they filed suit promptly to redress their rights after they learned of the existence of the federal statute.  Nonetheless, a delay of eight years to bring a wage claim is not the hallmark of the diligent plaintiff, as contemplated by the Latin maxim: *Vigilantibus non dormientibus aequitass subvenit; i.e.;* Equity aids the vigilant,

-14-

not those who slumber on their rights.  <u>Puerto Rico Ports Auth.</u>,
456 F.3d at 228.  Moreover, "many cases have held that ignorance
of one's legal rights does not excuse a failure to institute
suit."  <u>Marrero Morales v. Bull Steamship Co.</u>, 279 F.2d 299, 301
(1st Cir. 1960); *see also* <u>Pronav Charter II, Inc., v. Nolan</u>, 206
F. Supp. 2d 46, 49 (D. Mass. 2002).

Like the notion of reasonableness, the laches concept of
'prejudice to the defendant' is also indefinite.  Some courts
look for prejudice to the defendant only in the form of the
disadvantage in defending against a stale claim.  See <u>Vega v. The
Malula</u>, 291 F.2d 415, 418 (5th Cir. 1961).  But in <u>Lingenfelter
v. Keystone Consol. Industries, Inc.</u>, 691 F.2d 339, 342 (7th Cir.
1982), the Court wrote that, "Pecuniary losses of many types may
be considered in weighing the prejudice to a defendant."  *See
also* <u>EEOC v. Vucitech</u>, 842 F.2d 936, 942 (7th Cir. 1988).  In
<u>Lingenfelter</u>, the defendant/employer argued that it was
prejudiced by plaintiff/employee's delayed action for
reinstatement with backpay because of the wages it had expended
in paying plaintiff's replacement.  The Court concurred and
barred plaintiff's claim.  691 F. 2d at 341.

The relational nature of the laches analysis was described
by the Supreme Court in 1892 in a dispute over land (originally
purchased by plaintiff's husband for $1.25 an acre):

> ... the question of laches turns not simply
> upon the number of years which have elapsed

-15-

> between the accruing of her rights, whatever
> they were, and her assertion of them, but
> also upon the nature and evidence of those
> rights, the changes in value, and other
> circumstances occurring during that lapse of
> years.  The cases are many in which this
> defense has been invoked and considered.  It
> is true, that by reason of their differences
> of fact no one case becomes an exact
> precedent for another, yet a uniform
> principle pervades them all.  They proceed on
> the assumption that the party to whom laches
> is imputed has knowledge of his rights, and
> an ample opportunity to establish them in the
> proper forum; that by reason of his delay the
> adverse party has good reason to believe that
> the alleged rights are worthless, or have
> been abandoned; and that because of the
> changing condition or relations during this
> period of delay it would be an injustice to
> the latter to permit him to now assert them.

Galliher v. Cadwell, 145 U.S. 368, 371-372 (1892).  The Circuit

Court for the District of Columbia wrote in a similar vein that

"equitable boundaries blur as defendants invest capital and labor

into their claimed property; and plaintiffs gain the unfair

advantage of hindsight, while defendants suffer the disadvantage

of an uncertain future outcome."  NAACP v. NAACP Legal Defense

and Educ. Fund, 753 F.2d 131, 137 (D.C. Cir. 1985).

In the present case, the Court agrees that the equitable

boundaries blur and the balance of equities shift as Plaintiffs'

claims reach further back in time.  While it is true that

Plaintiffs did not know of their rights under § 10601, there

comes a time when they can no longer reasonably expect to recover

on claims that are so distant in time.  Plaintiffs might have

-16-

believed that it was unfair to be required to sign on for a
fishing trip with no foreknowledge of what their wages would be;
but none of them ever objected, protested or looked into what
their rights might be in a timely manner.  They slumbered on
those rights.

As for the prejudice to Defendants, it is important to note
that the monies that Plaintiffs belatedly claim has been all
distributed to the crewmen.  Defendants' failure to provide
Plaintiffs with written agreements did not result in any
enrichment to Defendants.  At the end of each trip, Defendants
deducted expenses and took their 58-63% share.  The remaining pot
of money was divided amongst the crew according to the broken
share system.  Had Plaintiffs received greater shares at the
time, the difference would have come from the shares of the other
crewmen.

Furthermore, the Court must emphasize that Plaintiffs were
not actually paid unfairly.  The layshare system is not illegal
or unjust.  All that the law requires is that a representative of
the ship owner and the crewman agree in writing to the rate of
payment before the ship leaves port.  It is very likely that in
most cases, a written agreement would have merely codified the
rate of pay that was paid to Plaintiffs, and that the written
agreement would not have changed their compensation at all.

The Court concludes that it is prejudicial to require

-17-

Defendants to go back eight years to rectify a violation which
would require them to disgorge money that they never received –
money that probably would not have been paid to Plaintiffs even
if Defendants had complied with § 10601.  The question that
persists is at what point in time does the boundary blur?  At
what point in time do Plaintiffs' claims become unreasonable, and
when does the prejudice to Defendants offset the consequences of
their statutory violation?  For guidance in drawing this line,
the Court examines the analogous statute of limitations.

<u>Analogous statute of limitations</u>

As this Court explained in its earlier decision, the
analogous statute of limitations is not applied strictly or
mechanically in conjunction with the laches defense.  The First
Circuit Court has recently written,

> In the maritime context, a laches
> analysis utilizes as a benchmark the
> limitations period contained in the most
> analogous statute.  That limitations period
> is not per se dispositive, but rather courts
> rely upon it to establish burdens of proof
> and presumptions of timeliness and
> untimeliness.  Hence, "if a plaintiff files a
> complaint within the analogous statutory
> period, the burden of proving unreasonable
> delay and prejudice falls on the defendant.
> If a plaintiff files after the statutory
> period has expired, the burden shifts and a
> presumption of laches is created."

<u>TAG/ICIB Services, Inc., v. Pan American Grain Co., Inc.</u>, 215
F.3d 172, 175-176 (1st Cir. 2000), (citing <u>Puerto Rican-American</u>

<u>Ins. Co. v. Benjamin Shipping Co.</u>, 829 F.2d 281 (1st Cir. 1987)).

The <u>TAG/ICIB</u> Court goes on to state that either analogous federal or state law may provide the limitations period.  215 F.3d at 176.  However, the Supreme Court has written that, "It is the usual rule that when Congress has failed to provide a statute of limitations for a federal cause of action, a court 'borrows' or 'absorbs' the local time limitation most analogous to the case at hand."  <u>Lampf, Pleva, Lipkind, et al., v. Gilbertson</u>, 501 U.S. 350, 355 (1991).  *See also* <u>Guerrido v. Alcoa Steamship Co.</u>, 234 F.2d 349, 358 (1st Cir. 1956) ("The district courts frequently follow the analogy of state statutes of limitations in determining whether such suits are barred by laches but they are not bound by such statutes.").

Consistent with such precedent, the Court looks to Rhode Island law for the statute most analogous to limit the present claims.  The pertinent statute is Rhode Island Gen. Laws § 28-14-20, which applies a three-year period for wage claims made to the Rhode Island Director of Labor and Training.  Accordingly, a presumption of laches attaches to Plaintiffs' claims for trips made prior to August 31, 1998, and a presumption of timeliness attaches to claims for trips after that date.  The Court has already stated that it is unreasonable for the crewmen to pursue wage claims from the distant past and, similarly, it is prejudicial to Defendants to be required to pay over money to

Plaintiffs that has already been distributed to the other
crewmen.   The three year cut-off date strikes a reasonable
balance between the competing interests here.   In any event,
Plaintiffs have failed to demonstrate that going back beyond
three years yields a reasonable result in this case.   Therefore,
this Court concludes that claims dating from before August 31,
1998, are barred by laches in the cases of Plaintiffs Doyle,
Hagaman, Lague and Richards.   Plaintiff Eric Edwards joined the
lawsuit on March 7, 2002.   Consequently, the bar date for his
claims is March 7, 1999.

### Calculations

Applying a cut-off date of August 31, 1998, eliminates the
possibility of any recovery for two plaintiffs: Timothy Doyle,
who fished only in 1996, and Greg Hagaman, who fished during
1995, 1996 and 1997.   Pursuant to § 11107's "highest rate of
wages at the port" language, the Court holds that the remaining
three Plaintiffs are entitled to whatever amounts to a full share
for each trip they went on within the three year period.   *See* TCW
Special Credits v. Chloe Z Fishing Co., 129 F.3d 1330, 1333 (9th
Cir. 1997).

Plaintiff Brian Lague participated in four fishing trips on
board the *FV Relentless* after the cut-off date.   These trips, and
the share earned, were:

> Trip #583   Return date: 9/10/98
> Earned: $1,794.80 Full share: $2,051.20   Difference: $256.40

-20-

```
Trip #584    Return date: 10/14/98
Earned: $1,356.90 Full share: $1,809.20    Difference: $452.30

Trip #588 Return date: 1/10/99
Earned: $2,669.62 Full share: $3,559.52    Difference: $889.90

Trip #590    Return date: 2/8/99
Earned: $2,349.42 Full share: $3,132.56    Difference: $783.14
```

The total difference between what Lague earned and what a full share would have been is $2,381.74.  This is the amount of recovery to which Plaintiff Brian Lague is entitled against Relentless, Inc.

Plaintiff Anthony Richards participated in many voyages on board the *FV Relentless* during the pertinent time period. However, for only three of these trips did he earn less than a full share.  These trips were:

```
Trip #590    Return date: 2/8/99
Earned: $2,740.99 Full share: $3,132.56    Difference: $391.57

Trip #592    Return date: 3/28/99
Earned: $2,600.71 Full share: $2,972.24    Difference: $371.53

Trip #593    Return date: 4/12/99
Earned: $3,578.26 Full share: $4,089.44    Difference: $511.18
```

The total of the difference between what Plaintiff Richards earned and the full shares paid for those trips is $1,274.28, and that is what he is entitled to recover against Relentless, Inc.

Plaintiff Eric Edwards participated in two trips on board the *FV Persistence* subsequent to March 7, 1999, for which he was paid less than a full share.  These trips were:

```
Trip #475    Return date: 12/11/00
Earned: $1,564.00 Full share: $2,502.40    Difference: $938.40

Trip #492    Return date: 8/26/01
Earned: $2,904.86 Full share: $3,319.84    Difference: $414.98
```

The total difference between what Plaintiff Edwards earned and what a full share would have been for those trips is $1,353.38, and that is what he is entitled to recover against Huntress, Inc., (the owner of *FV Persistence*).

A trial judge in admiralty cases has discretion in awarding and determining pre-judgment interest. *See* <u>CEH, Inc. v. F/V Seafarer</u>, 880 F. Supp. 940, 954 (D.R.I. 1995). The Court elects to award pre-judgment interest in this case and determines that a 6% interest rate is a fair approximation of the prevailing average rate for the period 2001 to the present. That rate will be applied from the date of the commencement of the suit to the date of judgment.

<u>Conclusion</u>

The Clerk shall enter judgment as follows:

1) For Defendants Huntress, Inc., and Relentless, Inc., on the claims of Plaintiffs Timothy Doyle and Greg Hagaman;

2) For Plaintiff Brian Lague, against Defendant Relentless, Inc., in the amount of $2,381.74, plus 6% per annum interest calculated from the date suit was filed (August 31, 2001) to this date;

3) For Plaintiff Anthony Richards, against Defendant Relentless, Inc., in the amount of $1,274.28, plus 6% per annum interest calculated from August 31, 2001, to this date;

-22-

4) For Plaintiff Eric Edwards, against Defendant Huntress, Inc., in the amount of $1,353.38, plus 6% per annum interest calculated from March 7, 2002 (when he joined this suit) to this date;

5) For Defendant Huntress, Inc., on the claims of Plaintiffs Brian Lague and Anthony Richards; and

6) For Defendant Relentless, Inc., on the claims of Plaintiff Eric Edwards.

It is so ordered.


Ronald R. Lagueux
Senior United States District Judge
February 20, 2007

-23-